WILLIAM WARE, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Superior Carriers, Appellee).

First District (Industrial Commission Division)   No. 1—00—1279WC

Opinion filed December 28, 2000.

Christopher Mose, of Slavin & Slavin, of Chicago, for appellant.

William D. Brewster, of Inman & Fitzgibbons, Ltd., of Chicago, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, William Ware, appeals a decision of the circuit court of Cook County confirming a decision of the Industrial Commission (Commission). The Commission reversed the decision of the arbitrator awarding benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1994)). The Commission found that claimant failed to prove that an employer-employee relationship existed between him and respondent, Superior Carriers (Superior). We reverse.

## BACKGROUND

Ware was an over-the-road truck driver who owned his own semi-tractor. Superior was a company engaged in the business of delivering freight for various customers. Superior provided tank trailers to Ware. On October 1, 1992, Superior dispatched Ware to deliver a load of methanol to a facility in Michigan owned by Shell Chemical (Shell). A pump, which was used for unloading, was leaking and Ware attempted to tighten the packaging on the pump. Ware's jacket became entangled in the pump's drive shaft, and he was severely injured. The pump was located on the tractor. Superior required that the tractor be equipped with the pump.

At the time of the accident, Ware was operating under an agreement with Superior titled "Equipment Lease Agreement Between Independent Contractor And Carrier." The lease referred to Ware as an independent contractor. The agreement provided that Ware would

lease his tractor to Superior, giving it "exclusive possession, control, and use for the limited purpose of complying with state and federal transportation law." Under the lease, Superior was required to pay for insurance to cover the vehicle when it was being operated in Superior's service. Superior also was to acquire "bobtail" insurance to cover the vehicle when it was not operated in its service. This insurance was charged to Ware. Ware was paid a percentage of the gross revenue from each particular job. The lease required Ware to submit several documents in order to be paid. The lease also provided that the cost of tank cleaning was to be split between the parties and that Ware was responsible for inspecting the tanks. One of the documents Ware had to turn in to be paid was a "tank cleaning check off list." The lease allowed Ware to hire other individuals to operate the truck, but required his hiring decisions to be approved by Superior. Ware was responsible for all costs of operation. The lease also prohibited Ware from using his tractor to haul freight for other companies without Superior's approval. The lease could be terminated at anytime, after 30 days from its effective date, if either party gave notice by certified mail. Superior could also terminate the lease immediately under various circumstances, including failure to provide a competent driver. This was not the first lease between the parties; rather, Superior would terminate a lease and issue a new one when necessary to comply with applicable local or federal regulations. The lease the parties were operating under at the time of the accident was signed January 14, 1991. Ware stated that he understood the lease and entered into it voluntarily.

Ware was paid a percentage of the gross revenue, except when hauling for Shell, where he was paid by the mile. He did not receive any form of a benefit package. Superior did not withhold income or social security taxes from Ware's compensation. Ware received a federal 1099 form rather than a W-2 form.

Ware had been employed by D&L Transport when Superior acquired that company in 1987. Ware was working under a lease agreement, and Superior canceled that lease and issued a new one. Since that time, Ware has worked exclusively for Superior. He quit in 1989, but he returned after two weeks. While working for Superior, Ware did not have any other customers and did not advertise as a separate business. He was, however, incorporated. Ware did have another driver operating his truck for an undetermined amount of time in 1991 and 1992.

Individual assignments were initiated by Superior through a travel order. Ware did not make arrangements with Superior's customers. The order would tell a driver what load he was carrying, where to deliver it, what times he had to pick up and deliver it, and what equip-

ment he needed to unload. The order also provided some routing information. Timetables reflected the requests of Superior's customers. Generally, drivers were not required to follow the suggested route, but if hazardous materials were being hauled, the route was mandatory in some areas.

Superior provided instructions to Ware regarding the operation and maintenance of his truck. Superior prohibited Ware from carrying unauthorized passengers in his truck. It required Ware to notify Superior if an accident occurred. Superior forbade Ware to operate more hours than allowed by federal law and threatened to terminate him if he received three speeding tickets in one year. Superior set forth procedures for operating in cold weather. These procedures included how to clean the vehicle, where to park, what kind of fuel to purchase, and when to check the trailer for condensation. Superior instructed Ware to remove all hoses from the trailer he was using and place them on a cleaning rack at the end of a shift. Superior required Ware to take a physical every two years. The results of the physicals were sent directly to Superior. Superior's company logo was displayed on Ware's tractor. Many of the requirements Superior mandated originated in federal regulations governing the trucking industry.

In 1989 and 1990, Ware was a part of a portion of Superior's fleet which was dedicated to serving Shell. Shell imposed additional requirements on this fleet. Ware was required to display the Shell logo, as well as the Superior logo, on his tractor. He was required to wear a uniform, bearing both companies' logos, and to shave his beard. OSHA required drivers to be clean shaven so that an oxygen mask would fit, if necessary. Because Shell required instant communication with these drivers, Superior installed a cellular telephone in Ware's truck. Ware was required to attend safety meetings while part of this fleet.

Ware's truck was registered in Superior's name. This was required by federal regulations. The cost of the license was deducted from Ware's compensation. The "bobtail" insurance Superior selected for Ware's truck listed both parties as insureds. The cost of this insurance was also deducted from Ware's compensation.

Ware was allowed to purchase his own workers' compensation insurance policy under the lease. In 1990, Superior put together an "occupational accident plan" through CIGNA. This was not a true workers' compensation plan. If a driver successfully made a workers' compensation claim against Superior, the benefits of this policy would be paid to Superior. All drivers were required to either procure their own workers' compensation insurance or enroll in the CIGNA plan at their own expense. Ware initially declined to participate in the CIGNA plan, despite not having his own insurance at the time. In May 1991,

Superior told Ware he would no longer be dispatched unless he enrolled in the CIGNA policy, and Ware complied. Ware had provided his own workers' compensation insurance in the past.

Following his accident, Ware was unable to make payments on his truck. He sold it on February 1, 1993. In a letter dated April 26, 1993, Superior terminated the lease agreement. Joe Benes, a Superior employee, testified that Ware inquired about employment as a "company driver" around this time.

The arbitrator awarded Ware benefits under the Act. 820 ILCS 305/1 et seq. (West 1994). The arbitrator relied primarily on Superior's right to control Ware's activities and the nature of Ware's work in relation to Superior's business. The arbitrator also cited Superior's retention of the right to discharge Ware and the fact that Superior provided equipment and material to Ware in support of his decision. The arbitrator noted that Ware was paid as an independent contractor, but found that this factor did not outweigh those upon which he relied.

The Commission reversed. The Commission found the present case controlled by Earley v. Industrial Comm'n, 197 Ill. App. 3d 309 (1990). The Commission found the case similar to Earley in the following respects: both cases involved similar vehicle insurance arrangements; both cases involved claimants who paid for their own health insurance; both cases involved claimants who were paid a percentage of gross revenue for shipments delivered; both cases involved parties operating under a lease with an exclusivity provision; and both cases involved similar arrangements regarding how the claimants were dispatched. The Commission also noted that Ware had incorporated and that the lease identified him as an independent contractor. Finally, the Commission rejected Ware's contention that Superior's greater ability to terminate the lease allowed Superior to exercise substantial control over Ware.

The circuit court of Cook County found that the Commission's decision was not contrary to the manifest weight of the evidence. The circuit court also relied on the present case's similarities to Earley. The court noted that the dispatch procedures used in both cases were the same. The court rejected Ware's reliance on the exclusivity provision in the lease, finding that it was imposed by federal regulations rather than Superior and that it applied to the tractor rather than to Ware personally. The court noted that most of the requirements Ware was subjected to originated either with federal regulations or customers. The trial court relied on Ware's corporate status in determining that the nature of his and Superior's business was different. Finally, the court noted Ware was paid as an independent contractor, provided

his own tractor, and was referred to as an independent contractor in the lease. The court found Superior's greater right to terminate the agreement insignificant. Ware now appeals.

## ANALYSIS

■ The sole issue raised in this appeal is whether the Commission erred when it determined that Ware was not an employee of Superior at the time of his accident. The question of whether an employment relationship existed at the time of an accident is one of fact. *Netzel v. Industrial Comm'n*, 286 Ill. App. 3d 550, 553 (1997). Accordingly, we will disturb the decision of the Commission only if it is against the manifest weight of the evidence. *Kirkwood v. Industrial Comm'n*, 84 Ill. 2d 14, 20 (1981). A finding is contrary to the manifest weight of the evidence if the opposite conclusion is clearly apparent. *Village of Oreana v. Industrial Comm'n*, 289 Ill. App. 3d 845, 850 (1997). We decline Ware's invitation to review this case *de novo*. Ware argues that the Commission applied the wrong legal standard in determining he was not an employee of Superior in that the Commission did not recognize that certain factors in the test for making this assessment are entitled to greater weight. While the Commission did not explicitly state certain factors are more important, our review of its opinion indicates it applied the proper test. Accordingly, we will apply the manifest weight of the evidence standard here.

■ No rigid rule of law exists regarding whether a worker is an employee or an independent contractor. *Area Transportation Co. v. Industrial Comm'n*, 123 Ill. App. 3d 1096, 1099 (1984). Rather, courts have articulated a number of factors to consider in making this determination. The single most important factor is whether the purported employer has a right to control the actions of the employee. *Bauer v. Industrial Comm'n*, 51 Ill. 2d 169, 172 (1972). Also of great significance is the nature of the work performed by the alleged employee in relation to the general business of the employer. *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982); *Peesel v. Industrial Comm'n*, 224 Ill. App. 3d 711, 716 (1992). Additional factors to consider are the method of payment, the right to discharge, the skill the work requires, which party provides the needed instrumentalities, and whether income tax has been withheld. *Wenholdt v. Industrial Comm'n*, 95 Ill. 2d 76, 80-81 (1983). Finally, a factor of lesser weight is the label the parties place upon their relationship. *Earley*, 197 Ill. App. 3d at 317. The term "employee," for purposes of the Act, should be broadly construed. *Chicago Housing Authority v. Industrial Comm'n*, 240 Ill. App. 3d 820, 822 (1992).

Turning to the most important factor, the right to control, we

conclude that the manifest weight of the evidence indicates Superior both had and exercised a right to control Ware's on-the-job activities. Although the test focuses upon the right to control, the actual exercise of control is strong evidence of the employer's right to control. *Bob Neal Pontiac-Toyota, Inc. v. Industrial Comm'n*, 89 Ill. 2d 403, 411 (1982). When actual control has been shown, only clear evidence that the employer exceeded its authority will overcome the inference that the right to control existed. *Bob Neal Pontiac-Toyota, Inc.*, 89 Ill. 2d at 411.

In the present case, Superior exercised substantial control over Ware's activities. It forbade him from carrying passengers. It required him to inspect his assigned tank trailer prior to starting a trip. The lease also provided that the tank be cleaned when Superior provided information as to the necessity of cleaning and designated the location where the cleaning was to occur. It instructed him regarding what type of fuel to buy, where to park, and how to inspect and maintain equipment during cold weather. Superior directed Ware to remove hoses from his trailer and place them on a cleaning rack at the end of his shift. Superior's dispatchers issued travel orders indicating what his load was, what equipment he needed, where he was going, and what time to be there. When Ware was carrying hazardous cargo, Superior would sometimes direct the route he was to follow as well. Superior required him to attend safety meetings, wear a uniform, shave, and display the Shell logo on his tractor while he was working in the fleet dedicated to serving Shell. When not dedicated to Shell, Ware was required to display Superior's logo on his tractor. If an accident occurred, Ware was instructed to contact Superior. Superior restricted the number of consecutive hours Ware could drive. Finally, Superior required Ware to pass a federally mandated physical. Results of the examination were sent directly to Superior. This extensive list of circumstances where Superior would direct Ware's behavior, coupled with Ware's compliance, is strong evidence that Superior had the right to control Ware's activities.

Superior complains that most of the areas in which it exercised control over Ware were to insure compliance with federal regulations or customer demands. We find the motivation for Superior's actions irrelevant. Professor Larson has noted that "it has been possible to make a strong showing of control by introducing detailed regulations \*\*\* and proving that the employer was personally responsible for their observance." 3 A. Larson & L. Larson, Larson's Workers' Compensation Law § 61.05(3), at 61—9 (2000).

In *Earley*, the court recognized that requirements imposed by federal regulations do support a finding that an employer-employee re-

lationship exists. The lease that the parties were operating under in that case gave the respondent trucking company "exclusive use and control" of claimant's tractor and trailer. This language was required by Interstate Commerce Commission (ICC) regulations. The *Earley* court held "the rules and regulations of the ICC are a factor to be considered as indicating that the respondent had the right to control the claimant's work, and [are] indicative of an employee status between the claimant and the respondent." *Earley*, 197 Ill. App. 3d at 315. Thus, the fact that Superior was acting to ensure compliance with federal regulations in the present case does not diminish the fact that it exercised control over Ware. See also *Gutenberg v. B&M Transportation Co.*, 27 Ill. App. 3d 732, 737 (1975); *Area Transportation Co.*, 123 Ill. App. 3d at 1102 ("The responsibility assumed by Area under ICC regulations has also been recognized as a substantial factor in considering a party to be an employer"). The same logic applies to Superior's directions to Ware that were intended to ensure compliance with customers' requirements. *Cf. Lister v. Industrial Comm'n*, 149 Ill. App. 3d 286, 290-91 (1986) (method of payment established by area home improvement contractors held indicative of employee status).

In *Earley*, the court found that the provision in the lease giving the respondent "exclusive use and control" of the claimant's tractor-trailer indicated a right to control. *Earley*, 197 Ill. App. 3d at 315. Similarly, the lease between Ware and Superior stated:

> "INDEPENDENT CONTRACTOR leases EQUIPMENT unto CARRIER for CARRIER'S exclusive possession, control, and use for the limited purpose of complying with state and federal transportation law."

As in *Earley*, this provision in the lease further indicates that Superior had the right to control Ware's activities.

Turning to the relative nature of Ware's work in relation to the general nature of Superior's business, we conclude that this factor also indicates Ware was an employee of Superior. Regarding this factor, our supreme court noted "because the theory of workmen's compensation legislation is that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act." *Ragler Motor Sales*, 93 Ill. 2d at 71. Even though Ware had incorporated, he had no customers of his own. He worked exclusively for Superior, served customers designated by

Superior, and was paid a percentage of what Superior received from these customers.

Numerous cases have found this factor to indicate employment on facts similar to the instant case. In *Peesel*, the court found the relative nature of the parties' work similar where the claimant was the owner of a dump truck who hauled sand and gravel to respondent's customers. *Peesel*, 224 Ill. App. 3d at 717. An operator of an ice cream cart was held to perform work that was an integral part of the respondent's business where the respondent was an ice cream distributor whose sole method of distribution was through these carts. *Luby v. Industrial Comm'n*, 82 Ill. 2d 353, 360 (1980). In determining whether a taxi driver is an employee, a relevant consideration is whether the respondent was " 'in the business of operating a fleet of cabs' or 'in the business of simply leasing vehicles with no interest in their operation as taxis.' [Citations.]" *Yellow Cab Co. v. Industrial Comm'n*, 238 Ill. App. 3d 650, 653 (1992). In the present case, Superior's business was hauling freight for various customers. Ware's job was hauling freight for Superior's customers. Accordingly, Ware's work was intimately related to Superior's business.

Having determined that the two most important factors point toward the existence of an employment relationship, we note that several other factors also indicate that such a relationship existed. One such consideration is which party provided the instrumentalities needed to conduct business. *Wenholdt*, 95 Ill. 2d at 80. Superior provided the trailer that Ware used to haul freight. While Ware provided the tractor, William Lavery, Superior's vice-president, testified that the trailers were too expensive for a driver like Ware to own. Professor Larson has noted that "control may be realistically inferred even when the employer owns only a part of the equipment, if that part is of considerable size and value." 3 A. Larson & L. Larson, Larson's Workers' Compensation Law § 61.07(3), at 61—20 (2000). Because Superior provided the most expensive piece of equipment used by Ware, this factor also weighs in favor of Ware being an employee.

Another factor to consider is whether Superior had a right to discharge Ware. *Wenholdt*, 95 Ill. 2d at 80. The lease in the present case provided that either party could terminate their relationship at any time after 30 days from its effective date. The only restriction on the parties' ability to terminate was that they were required to communicate their decision by certified mail. The unqualified right to discharge an employee must be distinguished from the ability to terminate a contract for *bona fide* reasons of dissatisfaction. *Earley*, 197 Ill. App. 3d at 316, citing 1C A. Larson, Workmen's Compensation

§ 44.35(g) at 8—172 (1986). At-will employment contracts "generally permit termination for any reason, good cause or not, or no cause at all." *Crenshaw v. De Vry, Inc.*, 172 Ill. App. 3d 228, 230 (1988). The lease between Ware and Superior could be terminated absent a breach by either party. The fact that the parties were required to communicate by registered mail does not significantly distinguish this relationship from at-will employment. Conversely, in *Earley*, upon which the Commission relied, the parties were required to give 30 days' notice in the absence of some breach of their agreement. *Earley*, 197 Ill. App. 3d at 316.

Superior also had the right to terminate the lease immediately for certain breaches including the failure to make available a competent driver, the failure to keep the tractor in satisfactory operating condition, the failure to comply with reasonable requests to modify Ware's tractor, or the violation of a substantial provision of the lease. In *Netzel*, the respondent had the right to discharge the claimant, a nurse, for unprofessional conduct, improper patient care, and violation of the respondent's policies and standards. The right to discharge under these circumstances was held to be indicative of an employment relationship. *Netzel*, 286 Ill. App. 3d at 555. Like the respondent in *Netzel*, Superior had a broad right to terminate the lease agreement immediately.

Finally, Ware was sometimes required to wear a uniform, which was inconsistent with his being an independent contractor. See *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 112-13 (1992). He was also engaged in a long, continuous, and exclusive relationship with Superior. This, too, indicates that he was an employee. See *Kirkwood Brothers Construction v. Industrial Comm'n*, 72 Ill. 2d 454, 460 (1978); *Area Transportation Co.*, 123 Ill. App. 3d at 1102. Considering all the foregoing factors in their totality, strong evidence exists that Ware was an employee.

Against the evidence set forth above, four factors point toward a finding that Ware was an independent contractor. First, the lease the parties operated under referred to Ware as an independent contractor. However, the label the parties apply to their relationship is a minor consideration which may " '[i]n a close case *** swing the balance by aiding in establishing the true intent of the parties.' " *Earley*, 197 Ill. App. 3d at 318, quoting 1C A. Larson, Workmen's Compensation § 46.30, at 8—263-64 (1986). It would be inappropriate to allow employers to defeat the goals of the legislature, set forth in the Act, through the artifice of mislabeling what is truly employment. *Earley*, 197 Ill. App. 3d at 317, quoting 1C A. Larson, Workmen's Compensation § 46.10, at 8—244 (1986). Second, the manner the parties dealt

with taxes points toward independent contractor status. Superior did not withhold income tax from its payments to Ware, and Ware had incorporated for tax purposes. Whether income tax is withheld has not been found to be a significant factor. *E.g., Luby*, 82 Ill. 2d at 359; *Peesel*, 224 Ill. App. 3d at 718. While these cases have dealt with the failure to withhold income tax, we do not see how the fact of Ware's incorporation significantly alters the analysis here. Accordingly, this factor is also entitled to little weight. Third, Ware was paid in a manner consistent with his being an independent contractor. *Earley*, 197 Ill. App. 3d at 315. He received a set percentage of the gross revenue from each load he hauled. Finally, as the *Earley* court noted, the fact that Ware purchased occupational accident insurance on his own is, at best, a weak indication of independent-contractor status, because it was done at Superior's insistence. See *Earley*, 197 Ill. App. 3d at 318.

Superior, the Commission and the circuit court all relied extensively on *Earley*, 197 Ill. App. 3d 309, in support of the proposition that Ware was not an employee. We find that case distinguishable. Most importantly, the *Earley* court noted that the respondent "only told the claimant when and where to pick up and deliver." *Early*, 197 Ill. App. 3d at 317. Conversely, Superior instructed Ware on the details such as where to put hoses from the trailer he was using at the end of his shift. In *Earley*, the claimant provided both the tractor and the trailer, thus the respondent, unlike Superior, provided no significant equipment. *Earley*, 197 Ill. App. 3d at 316. The claimant in *Earley* did perform trip leases for other customers, while Ware did not. *Earley*, 197 Ill. App. 3d at 315. Finally, in *Earley*, the parties were operating under a one-year lease, and the claimant had performed 19 trips for the respondent. *Early*, 197 Ill. App. 3d at 313-14. In the present case, the parties had been operating under a continuous agreement for a period of five years at the time of Ware's accident.

■ A majority of the factors, including the two most important ones, indicate Ware was an employee. Only four factors, three of which carry little weight, point toward an opposite conclusion. Accordingly, we conclude that the decision of the Commission was against the manifest weight of the evidence. The decision of the circuit court of Cook County confirming the decision of the Commission is reversed, and the cause is remanded to the Commission for resolution of all remaining issues.

Reversed and remanded.

McCULLOUGH, P.J., and HOFFMAN, HOLDRIDGE and RARICK, JJ., concur.