BUILDERS SQUARE, INC., Appellant, v. THE INDUSTRIAL COMMISSION
*et al.* (Ralph Peters, Ex'r of the Estate of Joyce Peters, Appellee).

Third District (Industrial Commission Division) No. 3—02—0700WC

Opinion filed June 24, 2003.

Bradley C. Knell, Cynthia A. Leos, and Tina R. Swanson (argued), all of
Knell & Poulos, P.C., of Chicago, for appellant.

Christopher R. Doscotch, of Janssen Law Center, of Peoria, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Joyce Peters (the decedent) fell while working for Builders Square on October 28, 1998, and died shortly afterward. Her husband, Ralph Peters (Peters), filed a claim against Builders Square seeking medical expenses, burial expenses, and death benefits under section 7 of the Workers' Compensation Act (820 ILCS 305/7 (West 2000)). The matter proceeded to an arbitration hearing where the arbitrator found that the decedent suffered a compensable accident and that the accident was a causative factor in her death. Accordingly, the arbitrator awarded Peters $28,827.30 in medical expenses, $4,200 in burial expenses, and $316.30 per week in death benefits.

Builders Square appealed to the Illinois Industrial Commission (Commission), which reversed the arbitrator's decision. The Commission found that Peters failed to prove (1) accidental injuries arising out of the decedent's employment, and (2) a causal connection between the decedent's work and her death. Peters appealed to the Peoria County circuit court, which reversed the Commission's decision and remanded for entry of an order consistent with the arbitrator's findings. Builders Square then filed this appeal claiming the circuit court erred in reversing the Commission's decision. We agree. Accordingly, we reverse the circuit court's judgment and reinstate the Commission's decision.

## BACKGROUND

The decedent's preexisting medical records document an incident in September of 1993 where she fell and injured her right ankle. Peters testified that he was not aware of the decedent having any problems with dizziness or passing out. To his knowledge, the decedent was never diagnosed with arrhythmia. However, their daughter said the decedent experienced an intermittently fast heart rate, and the medical records document a cardiac test in 1995 or 1996 where she wore a heart monitor for 24 hours. Apparently the test did not lead to treatment or medication for heart problems. A medical record from March of 1997 indicates that the decedent inexplicably lost approximately 40 pounds in just a few months. She also sustained three additional falls in 1998: once while carrying groceries up some stairs, once after slipping on wet grass in a ditch, and once after tripping on a ledge while carrying laundry.

The decedent was 54 years old when she fell at Builder's Square. She worked in the lawn and garden department with Bernard Beever (a coworker and long-time friend), who witnessed the incident. Beever

testified that the decedent was using an Exacto knife to open boxes of merchandise stacked on two pallets. The pallets were four feet square and approximately six inches high. The boxes were stacked one high on the pallets and were approximately two to three feet tall. The decedent bent over the boxes while performing her work. She was in an aisle approximately 10 feet wide with metal shelves on both sides.

Beever spoke with the decedent for approximately five minutes before she fell. She appeared completely normal at that time; particularly, she did not exhibit signs of paleness, slurred speech, perspiration, confusion, or imbalance. After their conversation, the decedent asked Beever to retrieve a pallet jack. When Beever had walked approximately 10 feet from the decedent to retrieve the jack, he turned around and saw her straighten up. After straightening up, she staggered two or three steps backward into the metal shelving and then collapsed face first on the concrete floor. Beever did not know if the decedent was holding her Exacto knife when she fell. After hitting the ground, the decedent shook violently for three seconds and began looking pale. She had not looked pale when she straightened up and staggered backward. Beever testified that the aisle was open to the general public, and there was no object on the floor—or defect in the floor—that caused the decedent to trip.

The decedent was ultimately taken to Saint Francis Medical Center, where she underwent a CT scan, EKG monitoring, and surgery by Doctor William Olivero. The surgical procedure involved a left frontal craniotomy with evacuation of a subdural hematoma. The decedent's postoperative diagnosis was an acute left subdural hematoma with a diffuse subarachnoid hemorrhage. She died shortly after the surgery. The EKG monitoring did not reveal evidence of a heart malfunction or arrhythmia.

Doctor Olivero testified that a subdural hematoma is a blood clot between the brain and the dura. He said 99% of all subdural hematomas are caused by trauma. In addition to her hematoma, the decedent exhibited venous bleeding along the floor of the middle fossa. Doctor Olivero explained that venous bleeding is more likely to stem from trauma than from other causes. In his opinion, the decedent's death was caused by a combination of the hematoma and the subarachnoid hemorrhage. He stated: "The more likely thing is that both of them were caused by trauma, since they happened at the same time." He did not know why the decedent staggered and fell in the first place.

Doctor Robert Collins (a neurologist retained by Peters) reviewed the decedent's medical records and concluded that her subdural hematoma and subarachnoid hemorrhage resulted from trauma. The

doctor did not know why the decedent staggered and fell in the first place. However, he believed the cause was not likely idiopathic because the decedent experienced no prior problems with fainting, dizziness, or vertigo.

Doctor David Schenker (retained by Builders Square) opined that the decedent's fall resulted from an idiopathic condition such as cardiac arrhythmia or a cerebral hemorrhage. He believed the decedent's prior falls raised the possibility of an arteriovenous malformation that was not detected by the CT scan. In his view, such a condition could cause episodic falls based on transient cerebral ischemia, seizure activity, or bleeding.

Doctor William Buckingham (also retained by Builders Square) opined that the decedent suffered a cardiac rhythm disturbance, which caused her to faint and fall. He supported his opinion by stating that the decedent had experienced past syncopal episodes with associated pallor. The doctor explained that heart monitors like the one the decedent wore in 1995 or 1996 do not detect all heart conditions. Such monitors will not indicate a cardiac condition unless they happen to be worn at the moment of a cardiac event. Accordingly, the doctor explained that testing must last longer than 24 hours to provide a reliable diagnosis.

Doctor Buckingham also observed that the decedent's body was affected by a particular rash. In his experience, the rash implicated systematic lupus erythematosus as another possible idiopathic factor in the decedent's fall.

After considering this evidence, the arbitrator found that the decedent sustained a compensable unexplained fall. According to the arbitrator:

> "Multiple reasonable inferences can be made from the evidence to explain [the decedent's] fall. [Her] foot could have got stuck underneath the pallet, causing her to fall backward. [She] could have been startled by something she found when she opened the box. [She] could have lost her grip on the cardboard box when she was opening the box causing her to fall backwards."

The arbitrator also found that the "accidental occurrence" was a causative factor in the decedent's death. The Commission reversed the arbitrator's decision, attributing the incident to an idiopathic condition with no increased risk from the employment. The circuit court reversed the Commission's decision, describing the finding of an idiopathic condition as speculative and conjectural.

## STANDARD OF REVIEW

■ Since different inferences can be drawn from the evidence presented at the arbitration hearing, we will not disturb the Commis-

sion's decision unless it is against the manifest weight of the evidence. *William G. Ceas & Co. v. Industrial Comm'n*, 261 Ill. App. 3d 630 (1994); *Oldham v. Industrial Comm'n*, 139 Ill. App. 3d 594 (1985). "In order for the decision to be against the manifest weight of the evidence, a review of the record must disclose that the conclusion opposite to that reached by the Commission was clearly the proper result." *Stapleton v. Industrial Comm'n*, 282 Ill. App. 3d 12, 16 (1996).

## ANALYSIS

### 1. "Arising Out Of"

■ A workers' compensation claimant bears the burden of proving, *inter alia*, an accidental injury "arising out of *** the employment." 820 ILCS 305/2 (West 2000). This requirement pertains to the origin of an accident. *Ceas*, 261 Ill. App. 3d 630. Accordingly, Illinois courts have divided workplace falls into distinct origin-based categories. A fall originating from an unknown neutral source is deemed "unexplained," while a fall originating from an internal and personal condition of the employee is deemed "idiopathic." *Oldham*, 139 Ill. App. 3d 594. The "arising out of" requirement is generally satisfied with unexplained falls but not with idiopathic falls.[1] *Stapleton*, 282 Ill. App. 3d 12.

■ To a certain degree, however, the label "unexplained" is a misnomer in this context. A claimant's burden of proof requires more than merely showing inability to explain why a fall occurred. In addition to such inability, a claimant must present evidence supporting a reasonable inference that the fall stemmed from an employment-related risk. After all, the "arising out of" requirement contemplates "a causal connection between the accidental injury and some risk incidental to or connected with the activity an employee must do to fulfill [her] duties." *Stapleton*, 282 Ill. App. 3d at 15. Awarding compensation for a purely unexplained fall would eviscerate this requirement.

Illinois courts have consistently applied the standard this way. For example, in *Sears, Roebuck & Co. v. Industrial Comm'n*, 78 Ill. 2d 231 (1979), a deceased employee was discovered lying near his forklift with a fractured skull. The Commission found that his fall arose out of his employment, and the supreme court affirmed the Commission's deci-

---

[1] In cases involving idiopathic falls, an exception exists for circumstances where employment conditions significantly contribute to the injury by increasing the risk of falling or the effects of the fall. *Stapleton*, 282 Ill. App. 3d 12; *cf. Rockford Hotel Co. v. Industrial Comm'n*, 300 Ill. 87 (1921) (employee suffered epileptic fit and fell into ash pit at work).

sion. However, rather than merely resting on the fact that no one knew why the employee fell, the court noted that the Commission had authority to draw reasonable inferences from the evidence presented at the arbitration hearing. The evidence included a showing that the forklift was not equipped with a "dead man's brake." *Sears*, 78 Ill. 2d at 233. Thus, the Commission could have inferred an employment-related risk connected to the fall. In other cases awarding compensation for so-called unexplained falls, this court has consistently identified facts supporting similar inferences. See, *e.g.*, *Knox County YMCA v. Industrial Comm'n*, 311 Ill. App. 3d 880 (2000) (claimant could not grab railings on stairway because her hands were occupied holding items connected to her work); *General Motors Corp., Central Foundry Division v. Industrial Comm'n*, 179 Ill. App. 3d 683 (1989) (claimant had to negotiate potholes while driving forklift); *Chicago Tribune Co. v. Industrial Comm'n*, 136 Ill. App. 3d 260 (1985) (floor where claimant slipped and fell could have contained ice and water); see also *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103 (1994) (claimant had to carry three heavy knives on stairway).

Such a standard is essential to avoid conflict with Illinois's disavowal of the positional risk doctrine (see *Brady v. Louis Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542 (1991)). Professor Larson aptly explains the situation as follows:

> "If an employee falls *** for no discoverable reason, the injury resembles that from stray bullets and other positional risks in this respect: The particular injury would not have happened if the employee had not been engaged upon an employment errand at the time. In a pure unexplained-fall case, there is no way in which an award can be justified as a matter of causation theory except by a recognition that this but-for reasoning satisfies the 'arising' requirement." 1 A. Larson & L. Larson, Larson's Workers' Compensation Law § 7.04(1)(a), at 7—15 (1999).

Since the Illinois Supreme Court has refused to make such a recognition (*Brady*, 143 Ill. 2d 542), a claimant alleging an unexplained fall must present evidence supporting a reasonable inference that the fall arose out of the employment (*i.e.*, originated in some employment-related risk).

■ In the instant case, the arbitrator apparently contemplated this standard when she offered three "reasonable inferences *** from the evidence to explain [the decedent's] *** unexplained fall." The arbitrator's inferences were: the decedent could have gotten her foot stuck beneath a pallet, causing her to fall backward; she could have been startled by something she found inside a box; and she could have lost her grip on a box, causing her to fall backward. These inferences,

unlike the inferences in *Sears, Knox, Nabisco, General Motors,* and *Chicago Tribune,* are not based on existing evidentiary facts. Bernard Beever personally witnessed the decedent's fall and described a scenario contrary to the arbitrator's suppositions. The decedent did not get her foot stuck beneath a pallet, jump in fright, or slip while trying to grip a box; she simply straightened up, staggered backward into some shelves, and then collapsed forward onto the floor. There was no object on the floor, or defect in the floor, that caused her to trip. There was also no evidence that her Exacto knife played a part in the incident. Furthermore, the area where she fell was open to the general public.

Under these circumstances, the Commission could have reasonably concluded that Peters failed to present evidence supporting an inference that the decedent's unexplained fall arose out of her employment. Although the Commission chose a different route (finding that the fall was idiopathic), we can affirm its decision on any basis contained in the record. See *General Motors,* 179 Ill. App. 3d 683.

Under the instant facts, the line between a noncompensable unexplained fall and an idiopathic fall is quite fine. Accordingly, the Commission's finding of an idiopathic fall also has support in the record. The decedent's medical history included four prior falls. Peters claims these falls resulted from mere clumsiness, but the Commission was entitled to draw its own inferences from the medical evidence. In addition to prior falls, the evidence showed a period of unexplained weight loss and an instance where the decedent was tested for heart problems. Although no treatment or medication resulted from the testing, Doctor Buckingham explained how a cardiac condition could have gone undetected. Furthermore, Doctors Olivero and Collins did not know why the decedent staggered and fell, and Doctors Schenker and Buckingham both opined that the fall resulted from an idiopathic condition.

Admittedly Peters makes some worthy arguments in favor of compensability, but those arguments do not change the above-mentioned circumstances. Although an opposite conclusion was available to the Commission, such a conclusion is not clearly apparent from the record. The circuit court erred because the Commission's decision is supported by sufficient evidence to withstand reversal.

## 2. Causation

Since the decedent's fall did not arise out of her employment, her condition of ill-being (a hematoma and a hemorrhage ostensibly stemming from the fall) was not causally related to her employment.

## CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment and reinstate the Commission's decision.

Reversed.

McCULLOUGH, P.J., and HOFFMAN, CALLUM, and GOLDEN-HERSH, JJ., concur.