# Illinois Official Reports

## Appellate Court

*City of Bridgeport v. Illinois Workers' Compensation Comm'n*,
2015 IL App (5th) 140532WC

| | |
|---|---|
| Appellate Court Caption | THE CITY OF BRIDGEPORT, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Stephen Harvey, Appellee). |
| District & No. | Fifth District<br>Docket No. 5-14-0532WC |
| Filed | December 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Crawford County, No. 13-MR-28; the Hon. Mark L. Shaner, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | R. Mark Cosimini, of Rusin & Maciorowski, Ltd., of Champaign, for appellant.<br><br>J. Robert Edmonds, of Edmonds Law Office, P.C., of Edwardsville, for appellee. |

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.
Presiding Justice Holdridge specially concurred, with opinion.

**OPINION**

¶ 1       The claimant, Stephen Harvey, filed an application for adjustment of claim against the City of Bridgeport (City), seeking workers' compensation benefits for the death of his wife, Jacqueline Harvey (decedent), in an alleged work accident on May 19, 2011. The claim proceeded to an arbitration hearing under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)). The arbitrator found that an employee-employer relationship did not exist between the decedent and the City and that the decedent did not sustain an accident that arose out of and in the course of her employment. The claimant appealed to the Illinois Workers' Compensation Commission (Commission). The Commission reversed the arbitrator's decision, finding that an employee-employer relationship did exist between the decedent and the City and that the decedent's accident arose out of and in the course of her employment. It ordered the employer to pay $2,069.25 for medical expenses, $8,000 for burial expenses, and $466.13 per week for 25 years or $500,000. The City filed a timely petition for review in the circuit court of Crawford County, which confirmed the Commission's decision. The City appeals.

¶ 2                                       BACKGROUND

¶ 3       The following factual recitation is taken from the evidence presented at the arbitration hearing on July 13, 2012.

¶ 4       The decedent starting working for the City as a water meter reader in March 2011. On the morning of May 19, 2011, she reported to city hall to retrieve her water meter reading equipment. This was the first month she was going to read the meters without a City employee accompanying her for training. While in the process of reading a water meter near the residence of Jeffrey and Vivian Perry, the decedent suffered a seizure, fell facedown in standing water about eight inches deep, and drowned. The claimant testified that the decedent had a seizure disorder and suffered from grand mal seizures.

¶ 5       Jeffrey and Vivian Perry testified by evidence deposition. Mr. Perry testified that, at about 9:45 a.m., he saw a car stopped in the road. He called Mrs. Perry to see if she knew whose car it was. The car was running, and the decedent's purse and a metal booklet that he believed was "the meter reader's book" were inside. Mrs. Perry, a registered nurse, testified they called out a few times and no one answered, so she telephoned the water department to see if a meter reader was near their house. She spoke to Jeannie Darnell, who confirmed that the decedent was in their area reading meters. While they were on the phone, Mr. Perry discovered the decedent. Mr. Perry testified that he saw the decedent facedown in the water about 1 to 1½ feet from the water meter. Mrs. Perry stated she told Ms. Darnell to send an ambulance. Mr. Perry picked the decedent up out of the water and started cardiopulmonary resuscitation (CPR). Mrs. Perry

testified that Mr. Perry started compressions and that she called the police. Mr. Perry stated that they did not detect any signs of life. They continued CPR until the ambulance arrived. The decedent was taken to the hospital, where she was declared dead.

¶ 6 Sheriff Russell Adams testified by evidence deposition. He investigated the decedent's death. He stated that he was called at 10:03 a.m. on May 19, 2011, and informed that there was a "body down at Low Water Bridge." He responded to the call and led the ambulance to the scene. He stated that a meter reader wand was found on the west side of the meter in the water.

¶ 7 Coroner Shannon Steffey testified by evidence deposition. She stated that Sheriff Adams contacted her to report that a woman had been found unresponsive in water in a rural area. She testified that, based on her investigation, the decedent was trying to read a water meter when she died. The coroner's report was admitted into evidence. Coroner Steffey wrote that the meter is in a rural setting and is located at an elevation approximately two feet lower than the road. Six to eight inches of water surrounded the meter. The cause of death was drowning due to clinical seizure.

¶ 8 Forensic pathologist Dr. John Allen Heidingsfelder testified by evidence deposition that he performed the autopsy on the decedent. He opined that the decedent had a clinical seizure while performing her work activities at a location near standing water, fell into the water, and drowned.

¶ 9 Stephen Boatman, the City's water department superintendent, testified about the job duties of a water meter reader. He testified that a water meter reader approaches each water meter with the electronic reader wand and touches the meter, which generates electronic information to the wand that is used to record the volume of water used. The City has approximately 1,200 customers with water meters, and the water meter reader must physically go to each water meter and read the usage on a monthly basis.

¶ 10 Mr. Boatman testified that part of the City's business involves providing water service to its customers who pay to use the water. The City determines how much to charge each customer based on the volume of water used. The volume of water used is calculated based on a water meter reading.

¶ 11 Mr. Boatman testified that the decedent and the other applicants for the water meter reader job filled out the same application as all City employees. Sara Sechrest, the City clerk, and Max Schauf, the City mayor, testified by evidence deposition and stated the same thing. Mr. Boatman stated that he was not on the hiring committee but that he participated in interviewing the decedent and the five other candidates for the water meter reader job. He testified that the hiring committee intended to hire an independent contractor to read the water meters. He admitted that some contractors hired by the City do not fill out the job application completed by the decedent. Ms. Sechrest testified that at one time City water department employees read the meters but that the City started a water mainline project, and the water department employees no longer had time to read the meters. The City decided to hire a contract meter reader and prepared a contract meter reader job description. Victoria Ralston, a City water clerk, testified that the City prepared the contract water meter reader document after it started the $3 million water fill project laying waterline and realized City workers did not have time to read the meters. Mayor Schauf testified that the City intended to hire the decedent as an independent contractor as opposed to an employee to save time and money. Ms. Sechrest testified that neither the City employees nor the decedent had a contract with the City.

¶ 12    Mr. Boatman testified that a member of the city council prepared a job description for a contract water meter reader for the City. A copy of the contract water meter reader job description was admitted into evidence. It states that the City will provide the water reading equipment and a vest for the meter reader but will not provide transportation. Pursuant to the description, the meter reader is expected to dress presentably; be personable and able to work with angry or difficult customers; read meters on route, record readings, and make the necessary calculations; read the meters between the twentieth and twenty-sixth of each month; be trained by qualified City water department personnel; identify water meter equipment problems and report defects to city hall; report violations of rules and regulations governing water consumption; maintain assigned tools and equipment; and if driving the route must provide the City with driver's license and insurance information. The description stated that the City was not liable for any property damage, personal injury, or accidents.

¶ 13    Mr. Boatman testified that the decedent was paid monthly and that City full-time and part-time employees are paid every two weeks. Full- and part-time employees have taxes withheld from their paychecks. Full-time City employees receive benefits, while part-time employees do not receive benefits. Ms. Sechrest testified that full-time City employees have state and federal taxes, social security, retirement pay, and any elected insurance deducted from their paychecks. She stated that the decedent was paid monthly with no taxes or benefits subtracted from her paycheck. The decedent was not entitled to any of the benefits the full-time City employees received.

¶ 14    Mr. Boatman testified that the City provided the decedent with a meter reading wand, a vest, and route books. The books were a set of metal-backed notebooks that described the locations of the water meters and provided a suggested route of meters located in close proximity to each other. He stated that, generally, the meter reader followed the suggested route but could read meters in any order she chose. The meters must be read between the twentieth and twenty-sixth of each month to maintain consistency in the billing. The decedent was authorized to start reading meters on the nineteenth to accommodate her other job. The decedent could set her own schedule so long as she read all the meters during daytime hours and within the allotted time frame. The decedent was not permitted to estimate usage. Mr. Boatman testified that a meter reader could travel the route by car, bike, on foot, or in whatever manner she chose.

¶ 15    Mr. Boatman testified that the City owned the water meter wand and attached computer. The equipment required special rechargeable batteries. The decedent went to city hall to get the batteries and to recharge them. He stated that the decedent would need permission to take the equipment home.

¶ 16    Ms. Sechrest testified that the decedent typically picked up her equipment in the morning and returned it in the evening. The wand was only to be used to read the City's water meters. If the decedent damaged the wand she was to take it to the City for repairs.

¶ 17    Mr. Boatman testified that Tom Perrin trained the decedent. Ms. Ralston testified that she and Ms. Sechrest also helped train the decedent. Mr. Boatman stated that in March and April 2011, a City employee accompanied the decedent on her route and that May 19, 2011, was the first time she had covered the route alone. Her training involved showing her the location of the water meters and teaching her how to use the wand. Mr. Boatman testified that reading a water meter does not require a high skill level. He stated that a person could be trained to read

a water meter in "thirty seconds." There is no license or certificate required to read a meter. The hardest part of the job is finding the meter.

¶ 18 Mr. Boatman testified that, to the best of his knowledge, there was no written contract between the decedent and the City. The city council voted to hire the decedent, and her termination required a vote by the city council. The decedent could quit or be terminated without reason at any time. Mr. Boatman testified that the City gives full-time employees an employee manual, which describes the disciplinary process. The employee manual was admitted into evidence. Employee discipline consists of a verbal warning issued by the city council personnel committee and the department head, a written warning given by the city council personnel committee and the department head, and termination by the written ballot majority vote of the city council. Mr. Boatman and Mayor Schauf admitted that City employees are at-will employees and can be terminated at will without following the policy set forth in the manual. Ms. Sechrest admitted that the job application specifies that, if hired, the employee will be an at-will employee, and there is no contractual document that guarantees the employee the right to go through the disciplinary process.

¶ 19 Mr. Boatman testified that the decedent was expected to contact him or city hall if she had a problem reading meters, if she was involved in an accident while working, if she damaged a customer's property, if she had a confrontation with a customer, or if she saw a customer illegally tapping into the water supply. She was expected to read all the meters and could not opt to be paid for only the meters she chose to read. Mr. Boatman stated that, if asked, the decedent was expected to recheck a meter.

¶ 20 The minutes from the special city council meeting on February 16, 2011, were admitted into evidence. The following discussion about the hiring of a water meter reader took place:

> "Pam asked that we start with the water meter reader. Darlene spoke on behalf of the personnel committee; the committee had interviewed 6 people for the water meter reader position. The committee recommends that we hire [the decedent]; she was the most qualified and the one most familiar with the equipment. Pam wanted to know if she was familiar with all of the meters that did not work and would not get fixed. Ed made a motion to hire [the decedent] for 450.00 a month, seconded by Kay, all approve."

¶ 21 Ms. Sechrest testified that the City provides water to its citizens who are its customers and charges them for the water based on the volume of water used during a period of time. The decedent was required to read all the meters during daylight hours during the allotted time frame dictated by the City, and she could not read them at another time of the month or just choose to read the easy meters and skip the others. If the decedent was unable to read all the meters in the allotted time frame or if she wanted to read the meters before the nineteenth of the month, she had to contact the City.

¶ 22 Mayor Schauf concurred that the meters must be read during the allotted time frame and that the decedent could not change the time frame. Changes to the time frame would have been at the City's discretion. The decedent was expected to read all the meters and could not pick and choose which ones to read.

¶ 23 Ms. Ralston testified that if a customer had a problem with a bill, the decedent could not take care of it, and that the customer would have to contact the City. If a customer complained that the meter reading was incorrect, Ms. Ralston would compile a list of meters to be

rechecked. If it was the week the decedent was working, Ms. Ralston would give the list to her to recheck the meters.

¶ 24  Mr. Boatman testified that the City excavated the area where the accident occurred in order to install the water meter. It is located off the lease road in a low-lying area of the woods, which floods when it rains. He stated that the decedent was required to step off the road into the woods and walk over to the water meter to get close enough to read it with the wand. He testified that there would be no reason for a person to be in that area except to read the water meter. Mayor Schauf stated that on the day of the accident, he went to the accident site. He said that the water meter was located in a low-lying area along the lease road and that it "had a hole around it." He testified that the area fills with water whenever it rains. Ms. Ralston testified that the area where the accident occurred is low lying and that it floods with rainfall.

¶ 25  The arbitrator held that an employee-employer relationship did not exist between the decedent and the City. He further held that the decedent did not sustain an accident that arose out of and in the course of her employment.

¶ 26  The claimant sought review of this decision before the Commission, which reversed the arbitrator's decision. It found that the decedent was an employee of the City. It found that the factors most illustrative of this relationship were the City's directing the decedent to read the water meters only during a one-week period each month during daylight hours, the intersection between her job duties and the City's business interests, and the similar manner in which the decedent and recognized City employees could have their employment terminated. It held that there was not one single factor that definitively favored the City's position that the decedent was an independent contractor. The Commission found that the decedent's accident arose out of and in the course of her having to work in conditions that included an eight-inch pool of rainwater, a hazard it found was not confronted by the general public. The Commission ordered the City to pay the claimant $2,069.25 for medical expenses and $8,000 for burial expenses. It further ordered the City to pay the claimant the greater of the sum of $466.13 per week commencing May 19, 2011, for 25 years or $500,000. One commissioner dissented.

¶ 27  The City sought judicial review of the Commission's decision in the circuit court of Crawford County, which confirmed the Commission's decision. The City now appeals. We affirm.

¶ 28                                    ANALYSIS

¶ 29  The City argues that the Commission's determination that an employee-employer relationship existed between the decedent and the City was against the manifest weight of the evidence. It is a "well-settled legal principle that proof of an employer-employee relationship at the time of an accident is an essential element of any action for an award under the Act." *Skzubel v. Illinois Workers' Compensation Comm'n*, 401 Ill. App. 3d 263, 266, 927 N.E.2d 1247, 1250 (2010). The question of whether an employment relationship existed at the time of the accident is one of fact. *Labuz v. Illinois Workers' Compensation Comm'n*, 2012 IL App (1st) 113007WC, ¶ 29, 981 N.E.2d 14. Accordingly, this court will disturb the Commission's resolution of that issue only if it is against the manifest weight of the evidence. *Id*. A finding of fact is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id*.

¶ 30    No rigid rule of law exists to determine whether a worker is an employee or an independent contractor. *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1122, 743 N.E.2d 579, 583 (2000). Whether a person is an employee is a vexatious question. *Roberson v. Industrial Comm'n*, 225 Ill. 2d 159, 174, 866 N.E.2d 191, 200 (2007). "The difficulty arises not from the complexity of the applicable legal rules, but from the fact-specific nature of the inquiry." *Id*. "When elements of both the relationship of employee and of independent contractor are present and the facts permit an inference either way, the Commission alone is empowered to draw the inferences, and its decision as to the weight of the evidence will not be disturbed on review." *Young America Realty v. Industrial Comm'n*, 199 Ill. App. 3d 185, 188, 556 N.E.2d 796, 798 (1990).

¶ 31    No rule has been, or could be, adopted to govern all the cases where the court must determine whether an individual is an employee or an independent contractor. *Roberson*, 225 Ill. 2d at 174-75, 866 N.E.2d at 200. Instead, the court considers whether the employer may control the manner in which the person performs the work; whether the employer dictates the person's schedule; whether the employer pays the person hourly; whether the employer withholds income and social security taxes from the person's compensation; whether the employer may discharge the person at will; whether the employer supplies the person with material and equipment; and whether the employer's general business encompasses the person's work. *Id*. at 175, 866 N.E.2d at 200. The court also considers the skill the work requires. *Labuz*, 2012 IL App (1st) 113007WC, ¶ 30, 981 N.E.2d 14. No single factor is determinative, and the determination rests on the totality of the circumstances. *Roberson*, 225 Ill. 2d at 175, 866 N.E.2d at 200.

¶ 32    The single most important factor to consider in determining whether a person is an employee is whether the purported employer has a right to control the person's actions. *Ware*, 318 Ill. App. 3d at 1122, 743 N.E.2d at 583. The City argues that it did not control the decedent's work activities. It contends that it did not control the hours, days, or method in which she performed her tasks. She was free to work any days between the twentieth and twenty-sixth of each month, she could read the meters in whatever order she chose, and she was free to report to work and leave when she wanted.

¶ 33    The Commission found that the decedent had some flexibility with respect to how and when she performed her duties. However, she had to read all 1,200 water meters during an allotted time frame and during daylight hours. Ms. Sechrest testified that if the decedent wanted to change the time frame to read the meters or if she was unable to read all the meters, she had to contact the City. Mayor Schauf testified that the meters had to be read during the allotted time frame and that the decedent could not alter the time frame without the City's permission. Mr. Boatman testified that the decedent was to contact him or city hall if she had a problem reading the meters, if she was involved in an accident while working, if she damaged a customer's property, if she had a confrontation with a customer, or if she saw a customer illegally tapping into the water supply. He and Ms. Ralston testified that, at the City's request, the decedent may have to recheck a water meter. The Commission found that the City controlled the decedent's actions. There is evidence in the record to support such a determination.

¶ 34    The City argues that the decedent "was mostly responsible for providing equipment." It asserted that "the main equipment [the decedent] needed was transportation, which she provided on her own." She was responsible for her own transportation, but this was not the

only piece of equipment she needed. To read the electronic water meters, a special wand was needed. The City supplied the decedent with the needed meter reader wand, electrical cord, computer attachment, batteries, and special chargers. The batteries are unique to the devices and not commonly available. The battery charger was kept at city hall. The decedent returned the batteries to city hall each day to switch with a charged set. Ms. Sechrest testified that if the decedent damaged the wand, she was to return it to the City for repairs. Mr. Boatman testified that the decedent would need permission to take the equipment home. Additionally, the City provided the decedent with route books that listed suggested routes and the specific location of water meters. The Commission found that "both parties supplied needed instrumentalities as [the City] supplied the equipment necessary to read and record the meter readings and [d]ecedent suppl[ied] the mode of transportation."

¶ 35 The City argues that the fact that it could discharge the decedent at will, the fact that she did not have taxes withheld from her paycheck, and the fact that she did not receive the same benefits as its other employees indicate she was an independent contractor. The Commission found that the fact that the decedent was paid once per month rather than twice per month was most likely the result of her seven-days-per-month work schedule. It concluded that the decedent simply was on a different pay schedule than the City's other employees. The Commission noted that neither the decedent nor part-time City employees were entitled to benefits. It found that "given this shared denial of benefits, the only divergence with respect to compensation found between [d]ecedent and at least [the City's] part-time employees, and presumptively its full-time employees, is that [d]ecedent was paid without having income taxes or FICA withheld from her paycheck." Whether income tax is withheld has not been found to be a significant factor in determining whether a party is an employee or an independent contractor. *Id*. at 1127, 743 N.E.2d at 586.

¶ 36 The City considered the decedent's employment to be at will. The procedure for terminating her, like other City employees, required a vote by the city council. The City argues that its employees had greater protection because the employee policy manual contained a three-step disciplinary process to be followed prior to termination. However, Mr. Boatman and Mayor Schauf testified that City employees are at-will employees and can be terminated without following the policy set forth in the manual. In addition, Ms. Sechrest testified that the job application completed by City employees specifies that, if hired, the employee will be an at-will employee and that there is no contractual document that guaranteed the employee the right to go through the disciplinary process. Based on the evidence, the decedent's at-will status was consistent with that of other City employees. This factor points to an employee-employer relationship.

¶ 37 The lack of specialized skill required to perform a job is indicative of an employee-employer relationship. *Skzubel*, 401 Ill. App. 3d at 268, 927 N.E.2d at 1251. The job of water meter reader required no license, certificate, or specialized skill. Mr. Boatman testified that a person could be trained to read a water meter in "thirty seconds" and that the hardest part of the job was locating the meters. The fact that the water meter reader position was an unskilled position supports the Commission's finding that the decedent was a City employee.

¶ 38 Another factor of great significance is the nature of the work performed by the alleged employee in relation to the general business of the employer. *Ware*, 318 Ill. App. 3d at 1122, 743 N.E.2d at 583. "[B]ecause the theory of workmen's compensation legislation is that the

cost of industrial accidents should be borne by the consumer as a part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act." *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71, 442 N.E.2d 903, 905 (1982). One of the City's functions involves providing water service to its customers who pay to use the water. The decedent's job was to record the water usage rates of the City's customers to ensure that the City had an accurate record of its customers' water consumption for billing purposes. Her job duties also entailed reporting malfunctioning water department equipment and violations of rules and regulations governing water consumption. The decedent's services in reading meters formed a regular part of the cost of the City's business of supplying water to its residents, and her work did not constitute a separate business distinct from that of the City. The Commission found that, in performing her job duties, the decedent helped the City meet its duty of providing services to its residents. There is sufficient evidence in the record to support such a finding.

¶ 39 The Commission also considered how the parties viewed their relationship. Mr. Boatman, Ms. Sechrest, Ms. Ralston, and Mayor Schauf testified that the decedent was an independent contractor. It is uncertain how the decedent viewed her relationship with the City. She completed the same job application form as all City employees. The form includes no information that would alert her that she was applying for a contract position. There is no information in the record that she was ever given the contract water meter reader job description. The minutes from the city council meeting where the council voted to hire her do not indicate that she was being hired for a contract position. The Commission found that because only the City was available to comment on the topic, it was unable to properly ascertain how the parties viewed their relationship.

¶ 40 The Commission held that the decedent was an employee despite the City's intention of making her an independent contractor. It found the most persuasive factors were that the City controlled the decedent in that she had to perform her job duties each month during a one-week period during daylight hours, that her job duties and the City's business interests intersected, and that she and City employees could be terminated in a similar manner. The Commission further found that not one single factor definitively favored the City's position that the decedent was an independent contractor. It is within the province of the Commission to weigh the evidence and to decide among competing inferences. *Roberson*, 225 Ill. 2d at 187, 866 N.E.2d at 207. This court will not reject permissible inferences drawn by the Commission simply because different inferences might be drawn from the same facts, nor will this court substitute its judgment for that of the Commission on such matters unless its findings are contrary to the manifest weight of the evidence. *National Freight Industries v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, ¶ 26, 993 N.E.2d 473. We cannot say that the Commission's decision that the decedent was a City employee was against the manifest weight of the evidence.

¶ 41 The City argues that the Commission's decision that the decedent sustained an accidental injury that arose out of and in the course of her employment was contrary to law and against the manifest weight of the evidence. For accidental injuries to be compensable under the Act, the claimant must show that the injuries arose out of and in the course of her employment. *Illinois Consolidated Telephone Co. v. Industrial Comm'n*, 314 Ill. App. 3d 347, 349, 732

N.E.2d 49, 51 (2000). "A question of law arises only where no factual matters are disputed or where no conflicting inferences can be drawn from the facts." *Oldham v. Industrial Comm'n*, 139 Ill. App. 3d 594, 596, 487 N.E.2d 693, 694 (1985). The Commission may draw inferences from the undisputed facts to determine whether an injury arose out of employment or whether the employment increased the risk of injury, and such inferences will not be disturbed unless they are against the manifest weight of the evidence. *Id*. at 596, 487 N.E.2d at 694-95. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Stapleton v. Industrial Comm'n*, 282 Ill. App. 3d 12, 16, 668 N.E.2d 15, 19 (1996). A Commission's decision is not against the manifest weight of the evidence if there is sufficient factual evidence to support it. *Id*.

¶ 42    The City argues that the decedent had an idiopathic fall in a location that did not pose a heightened risk of injury. An idiopathic fall originates from an internal and personal condition of the employee. *Builders Square, Inc. v. Industrial Comm'n*, 339 Ill. App. 3d 1006, 1010, 791 N.E.2d 1308, 1311 (2003). It is undisputed that the decedent sustained an idiopathic fall. However, injuries resulting from an idiopathic fall are compensable if the employment significantly contributed to the injury by placing the employee in a position increasing the dangerous effects of the fall. *Elliot v. Industrial Comm'n*, 153 Ill. App. 3d 238, 244, 505 N.E.2d 1062, 1066-67 (1987).

¶ 43    The City argues that the decedent's employment did not place her in a position increasing the dangerous effects of her fall because she fell into a rain puddle, which is common everywhere. It asserts that the general public is routinely exposed to rain puddles. The City contends that the ground where the decedent fell posed no greater danger than that to which the public was exposed. It further argues that the decedent was not obligated to read the meter at the location of the injury on that specific day.

¶ 44    "A reviewing court will not reweigh the evidence, or reject reasonable inferences drawn from it by the Commission, simply because other reasonable inferences could have been drawn." *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64, 862 N.E.2d 918, 924 (2006). Coroner Steffey testified that, based on her investigation, the decedent was trying to read a water meter when she died. In her report, she noted that the meter was located in a rural setting at an elevation approximately two feet lower than the road and that six to eight inches of water surrounded the meter. Mr. Boatman testified that the City excavated the area where the accident occurred to install the water meter. He stated that the water meter is located off the road in a low-lying area of the woods that floods when it rains. He testified that the decedent had to step off the road into the woods and walk over to the water meter in order to get close enough to read it with the wand. He further testified that the only reason the decedent would be in that area was to read the water meter. Mayor Schauf and Ms. Ralston testified that the water meter was located in a low-lying area that floods when it rains. The general public is not routinely exposed to eight-inch-deep floodwater in secluded, low-lying woods.

¶ 45    The decedent was required to read all 1,200 water meters between the twentieth and twenty-sixth of each month. While the decedent had some flexibility as to when she could read the water meters, she did not have the same flexibility as the general public to avoid standing water and other rural conditions. Her job required her to read the meter in this low-lying secluded area where water pooled whenever it rained. The water was deep enough to cause drowning, and the remoteness of the location meant that someone injured there would not likely receive prompt assistance. The Commission found that the decedent's accident "arose

- 10 -

out of and in the course of her having to work in conditions that included an eight-inch pool of rainwater, a hazard it finds is not confronted by the general public." This finding is not against the manifest weight of the evidence.

¶ 46                                    CONCLUSION

¶ 47         For the foregoing reasons, we affirm the judgment of the circuit court of Crawford County.

¶ 48         Affirmed.

¶ 49         PRESIDING JUSTICE HOLDRIDGE, specially concurring.

¶ 50         I agree that there was sufficient evidence in this case to support the Commission's findings of an employment relationship and an accidental injury arising out of the decedent's employment. I therefore join in the majority's judgment. I write separately because I disagree with one aspect of the majority's analysis regarding the employment relationship issue. In support of its holding, the majority stresses the connection between the nature of the work performed by the decedent and the nature of the City's "business" of supplying water to its residents. *Supra* ¶ 38. Relying upon *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982), and *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1122 (2000), the majority states that " '[b]ecause the theory of workmen's compensation legislation is that the cost of industrial accidents should be borne by the consumer as a part of the cost of the product,' " " 'a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act.' " *Supra* ¶ 38 (quoting *Ragler Motor Sales*, 93 Ill. 2d at 71); see also *Ware*, 318 Ill. App. 3d at 1124. The majority notes that "[t]he decedent's services in reading meters formed a regular part of the cost of the City's business of supplying water to its residents," "her work did not constitute a separate business distinct from that of the City," and "in performing her job duties, the decedent helped the City meet its duty of providing services to its residents." *Supra* ¶ 38. Following *Ragler Motor Sales* and *Ware*, the majority concludes that these facts weigh in favor of finding an employment relationship.

¶ 51         The analysis employed by the majority finds support in our prior decisions. Applying the rule announced in *Ragler Motor Sales*, we have repeatedly found an employment relationship where, *inter alia*, the claimant performs work that is "an integral part of" or is "intimately related to" the respondent's business. *Ware*, 318 Ill. App. 3d at 1125.

¶ 52         I question the logic of this approach. The purpose of finding an employment relationship under such circumstances is, purportedly, to ensure that "the cost of industrial accidents [is] borne by the consumer as a part of the cost of the product." *Ragler Motor Sales*, 93 Ill. 2d at 71. However, that result could be achieved just as effectively without finding an employment relationship. An independent contractor may obtain her own workers' compensation insurance. Presumably, the cost of such insurance would be reflected in the price that she charges a municipality or a private company for her services and then passed on to the municipality's or company's customers. Thus, the cost of the accident will be "borne by the consumer[s] as part of the cost of the product" regardless of whether the claimant is deemed an employee or an independent contractor.

- 11 -

¶ 53        Moreover, under the rule currently applied by our courts, this factor will *always* cut in favor of finding an employment relationship in cases involving contractors whose work forms "an integral part of" the municipality's or company's business, which is very often the case when a municipality or company hires an independent contractor. Because of the importance that our courts currently attach to this factor, this stacks the deck heavily in favor of an employment relationship in a great number of cases. In my view, courts should stop considering this factor in determining whether an employment relationship exists. At the very least, courts should stop placing such heavy reliance on this factor. I hope our supreme court will reexamine this issue in the near future.