LARRY E. EARLEY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Crown Transport, Inc., Appellee).

Fourth District (Industrial Commission Division)   No. 4—89—0414WC

Opinion filed April 19, 1990.

Matthew W. Kelly, of Coppinger, Carter, Schrempf & Blaine, Ltd., of Alton, for appellant.

Rammelkamp, Bradney, Dahman, Kuster, Keaton & Fritsche, P.C., of Jacksonville (Forrest G. Keaton, of counsel), for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The claimant, Larry E. Earley, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*) for a back injury he alleged arose out of and in the course of his employment with the respondent, Crown Transport, Inc. The respondent disputed that there was an employer-employee relationship between the respondent and the claimant. After a hearing on the claimant's application, the arbitrator determined that there was not an employer-employee relationship between the claimant and the respondent at the time of the claimant's accident, and she denied the claimant benefits. The Industrial Commission, without considering further evidence, affirmed the arbitrator's decision. The circuit court confirmed the Industrial Commission's decision, and the claimant appeals. The sole issue presented for review is whether the Industrial

Commission's determination that there was not an employer-employee relationship between the claimant and the respondent was erroneous either as a matter of law or because it was against the manifest weight of the evidence.

At the hearing before the arbitrator, the evidence presented consisted of the claimant's testimony; the evidence deposition of Dr. Walter Wheelhouse, the claimant's treating physician; and various documents. Because of the nature of the issue involved, *i.e.*, the employer-employee relationship, the doctor's testimony and the medical records introduced need not be discussed as this evidence is irrelevant to this issue.

The claimant testified that on December 31, 1982, he signed a one-year equipment lease agreement with the respondent which became effective on January 4, 1983. Under the lease agreement, the claimant provided the tractor and trailer truck; performed all the maintenance and repair of the equipment; provided fuel and lubricants; and provided a driver to haul shipments for the respondent. The claimant paid for the truck's licenses; however, the licenses were in both his and the respondent's names, and upon termination of the lease agreement, the claimant returned the license plates to the respondent. The claimant was responsible for paying all of the taxes on the truck and for paying the necessary road tolls. Upon delivering the respondent's shipment to its destination, if help was needed to unload the trailer, it was the claimant's responsibility to hire and to pay someone for this purpose. The claimant could hire other drivers to drive his truck, but these drivers had to be approved by the respondent before driving any of the respondent's shipments. Although the respondent told the claimant the date and time for picking up a load and for unloading the shipment, it was the claimant who chose the route to and from his destination. When the claimant was to perform a job for the respondent, either Clayton Erixson would call the claimant or the claimant would call Erixson or the respondent's dispatcher, Perry Franks, in Memphis, Tennessee.

The claimant testified that under the lease agreement, the respondent was responsible for the liability insurance for damage resulting from the operation of the claimant's truck, but the respondent was not liable for damage to the claimant's truck. The claimant had no health insurance, but he did pay for workers' compensation insurance for himself and his drivers. The claimant's workers' compensation insurance was purchased by the claimant through the respondent by deducting the premiums from the payments made to the claimant from the respondent.

In addition to the lease agreement, the claimant had completed an employment application for his work with the respondent. Likewise, any drivers hired by the claimant had to fill out a similar employment application for the respondent.

The respondent required the claimant to have a physical examination and to show evidence of certification as a truck driver. The claimant explained that he had the requisite certifications from the United States Department of Transportation (DOT), from the Interstate Commerce Commission (ICC), and from different States. The certifications which the respondent required were a medical certification, which indicated that the claimant was physically fit to drive a truck; a road test certification, which indicated that the claimant had taken and passed a driving test; and a "certificate of qualifications," which indicated that the claimant had passed the 100-question DOT test. On cross-examination, the claimant admitted that the certifications required by the respondent were the same certifications that a truck driver was required by the ICC or DOT to have, whether the driver worked for a company or was self-employed.

According to the claimant, the ICC required that the decal number of the carrier's ICC permit be displayed on a truck, and it was the respondent's ICC decal number which was displayed on the claimant's truck, as were the respondent's State stickers. The State stickers indicated to a police officer or other authority that the liability insurance required and the fuel taxes required had been purchased or paid for by the carrier.

According to the claimant, his payment for his services for the respondent was a percentage of the gross revenue of the shipment he delivered for the respondent. From these payments, the respondent deducted the claimant's workers' compensation insurance premiums and any cash advances paid to the claimant, but the respondent did not deduct for the claimant's income taxes or social security. The claimant received the same percentage payment from the respondent whether the claimant drove or another driver drove the claimant's truck. While the lease was in force, the claimant primarily drove for the respondent, but he was permitted to do "trip leases," *i.e.*, haul other shipments for other carriers. If the claimant picked up a trip lease, it was arranged through the respondent, and the payment for the trip lease was paid to the respondent, who then paid the claimant the same percentage payment as if the claimant was hauling for the respondent.

The claimant had been given oral instructions by Harry Stokes, the vice-president or president of respondent, with regard to what was to be done if the claimant had an accident while on the road, either going

to or coming from a destination. In that event, the claimant was to call the respondent's personnel immediately, and the respondent would take care of the insurance and other pertinent matters. The claimant had also received these same instructions on a printed form in his employment application packet. The claimant testified that he was required to call the respondent when he had an accident in order to enable the respondent to tell a customer where a shipment was if a customer called and inquired about his order.

On April 5, 1983, the claimant picked up a shipment for the respondent. Before leaving for his destination with the shipment, the claimant had pulled into Interstate Garage to have the fuel injectors on his truck changed. Erixson was aware that the claimant had taken the truck to the garage. Once inside the garage, Henry Carl, who was not identified in the record, but who was apparently the mechanic working on the claimant's truck, removed the air cleaner from the claimant's truck. Carl, who was on top of the truck, gave the air cleaner to the claimant and asked him to place the air cleaner on the floor by the wall. The air cleaner was described by the claimant as being 6 inches high, 28 inches wide, 34 inches long and weighing almost 70 pounds. The claimant took the air cleaner as requested, and as he turned to set it by the wall, the claimant's back "popped."

The claimant left the garage, went to Erixson's office and told Erixson what had happened, and then called his wife to come and take him home. The claimant was in pain, but he did not seek immediate treatment for his back. Instead, he went home and made arrangements to have the shipment on his truck taken to Alabama. To do this, he hired Ed Shoptaw to drive his truck. After Shoptaw was cleared by the respondent, Shoptaw continued with the delivery of the load, and during the time the claimant was unable to work because of his back, Shoptaw drove the claimant's truck to deliver subsequent shipments for the respondent. The claimant returned to work on May 13, 1983. On June 15, 1983, the respondent and the claimant terminated their lease agreement by mutual consent.

The claimant introduced into evidence the bills of lading or delivery receipts of the jobs the claimant had performed for the respondent under the lease agreement. These documents showed that the claimant had delivered goods for the respondent on January 21, 1983; January 26, 1983; January 28, 1983; February 1, 1983; February 8, 1983; February 15, 1983; February 17, 1983; February 21, 1983; February 23, 1983; March 1, 1983; March 15, 1983; March 26, 1983; March 30, 1983; April 5, 1983; April 11, 1983; April 20, 1983; April 26, 1983; April 29, 1983; May 6, 1983; May 13, 1983; and June 1, 1983. The bills of lading

from April 5, 1983, through May 13, 1983, indicated that Ed Shoptaw drove the claimant's truck on those dates. Lastly, the lease agreement between the respondent and the claimant was admitted into evidence. The pertinent provisions of the lease agreement will be discussed later in this opinion.

■ On appeal, the claimant contends that the Industrial Commission's determination that the claimant was an independent contractor was either erroneous as a matter of law or was against the manifest weight of the evidence. The claimant supports his argument that the Industrial Commission's determination was erroneous as a matter of law by citing to the rules and regulations of the ICC. The ICC's rules, to which the claimant refers, require a lease agreement, such as the one here, to include a provision that the authorized carrier has exclusive possession, control, and use of the leased equipment for the duration of the lease. Therefore, because Federal law requires the respondent to have the exclusive possession and control provisions in the lease, the claimant argues that this confers upon the respondent the right to control the work of the claimant, thereby creating an employee status for the claimant as a matter of law. While the ICC rules and regulations are a factor to consider in determining a claimant's employment status, these rules are not conclusive as a matter of law as the claimant contends. *Area Transportation Co. v. Industrial Comm'n* (1984), 123 Ill. App. 3d 1096, 465 N.E.2d 533.

■ The difficulty in determining a claimant's employment status was succinctly stated by the supreme court as follows:

"Determining whether one is an independent contractor or an employee is often a vexing problem. [Citation.] Since many jobs contain elements of each, there is no clear line of demarcation between the status of employee and independent contractor. [Citations.] For this reason, when the facts of a particular case are susceptible to either interpretation, it is within the Industrial Commission's province to draw inferences and evaluate the credibility of the witnesses in arriving at a decision. [Citations.] On review, that decision will only be reversed if it is against the manifest weight of the evidence." (*Kirkwood v. Industrial Comm'n* (1981), 84 Ill. 2d 14, 20, 416 N.E.2d 1078, 1080.)

Thus, whether a claimant is determined to be an independent contractor or an employee is crucial, for it is the initial decision of the employment status of a claimant which determines whether he is entitled to compensation benefits. See *Alexander v. Industrial Comm'n* (1978), 72 Ill. 2d 444, 381 N.E.2d 669.

■ In determining whether an individual is an independent con-

tractor or an employee, no one factor is determinative, but several factors must be considered. Those factors include the right to control the manner in which the work is done, the method of payment, the right to discharge, the skill required in the work to be done, and who provides tools, materials, or equipment. (*Wenholdt v. Industrial Comm'n* (1983), 95 Ill. 2d 76, 447 N.E.2d 404.) Another factor to be considered is the nature of the worker's work as it relates to the employer's business. *Wenholdt*, 95 Ill. 2d 76, 447 N.E.2d 404.

Determining the claimant's employment status in this case is not an easy task as there are factors present indicating both an independent-contractor and an employee status. The evidence revealed that the respondent directed the claimant where and when to pick up and deliver the shipment to be hauled for the respondent. During the term of the lease agreement, the claimant appeared to work solely for the respondent. Even the trip leases the claimant performed were apparently arranged by the respondent. This would imply that the claimant was an employee of the respondent. However, the claimant was paid for the trip leases in the same manner as for the shipments he made for the respondent, in that the respondent billed the other motor carrier for the hauling, and then, in turn, paid the claimant a percentage of the gross revenue of the job performed, which implied an independent-contractor status.

In the lease agreement itself, there was a provision that the respondent would pay the claimant a percentage of the gross revenue upon receipt of the required documents, in consideration for the "exclusive use and control of said equipment and the furnishing of a qualified driver while utilized by the Carrier [respondent] in line haul service from Shipper to Consignee." This language, required by the ICC, suggested that the respondent had a limited but exclusive right to control the claimant's equipment. As we noted earlier, the rules and regulations of the ICC are a factor to be considered as indicating that the respondent had the right to control the claimant's work, and is indicative of an employee status between the claimant and the respondent.

In contrast, while the respondent could direct the claimant on where and when a shipment was to be picked up and delivered, it was the claimant who chose the route he was to follow in delivering the shipments. Additionally, if the claimant needed help in unloading a shipment, the claimant was responsible for hiring the help he required and for paying whomever he hired. These factors indicated an independent-contractor status.

The method of payment for the work done and the furnishing of the equipment used in performing the work both indicated that the

claimant was an independent contractor. As we noted previously, the claimant was paid a percentage of the gross revenue of each shipment hauled, and from this payment, the claimant paid his own income taxes and social security. With regard to the furnishing of equipment, the evidence disclosed that the claimant owned the tractor and trailer leased by the respondent, and he also paid for the truck's maintenance and repair. We also note that any drivers hired by the claimant, subject to the respondent's approval, were paid by the claimant.

Another factor to consider in determining the claimant's employment status was whether the respondent had a right to discharge the claimant for any reason at any time. Three clauses of the lease agreement must be considered in determining this factor. Clause 16 of the lease agreement provided that the lease agreement could be terminated by either party for any reason, upon the giving of 30 days' notice. Professor Larson had considered such language when he stated:

> "[T]he unqualified right to fire must be distinguished from the right to terminate the contract of an independent contractor for bona fide reasons of dissatisfaction, particularly when the right of termination for dissatisfaction is expressly reserved." (1C A. Larson, Workmen's Compensation §44.35(g), at 8—172 (1986).)

Clause 16 does not appear to give the respondent an absolute right to discharge, but seems to be a mutual provision which either party to the agreement could invoke if dissatisfied.

Similarly, clause 17 of the lease agreement stated that the lease could be terminated immediately by either party if there is a substantial breach of the lease agreement. Again, this does not appear to be an absolute right to discharge as it is a mutual provision and would require the showing of a substantial breach of the agreement. Lastly, clause 18 provided that the respondent could immediately terminate the lease agreement in the event the claimant "substantially or repeatedly" violated the safety rules or regulations of any Federal, State or provincial government. From this clause it could be inferred that the respondent could discharge the claimant at any time, thereby implying an employee status. However, it is interesting to note that clause 18 did not include termination for the violation of the respondent's policies and procedures, which language would have created a stronger inference that the claimant was an employee.

We next consider the nature of the claimant's work relative to the respondent's business. In trucking cases such as this, this is a close consideration. By inference, we conclude that the respondent was in the business of transporting shipments for profit. This was the same business in which the claimant was employed, and the claimant could

operate his business as an independent contractor, which he did after the termination of the lease agreement between him and the respondent. The record reveals that in August 1983, two months after the termination of the lease agreement, the claimant became self-employed and operated under the name of Earley Transportation. Further, since the respondent, during the term of the lease agreement, only told the claimant when and where to pick up and deliver shipments, it could be said that the respondent was only interested in the end result, *i.e.*, that the shipments be transported within a given time to a customer, and that the details of how this was accomplished were left to the claimant, thereby implying that the claimant had an independent contractor status.

Two remaining factors in the consideration of the claimant's employment status need to be addressed. These factors, although minor, nevertheless enter into our consideration. The first of these is the labelling of the claimant's employment status given by the parties in their lease agreement. In clause 14 and clause 21 of the lease agreement, it was stated that the claimant was to be considered an independent contractor. Whether this factor should be considered dispositive of the claimant's employment status is controversial, as can be determined from the following passage from Professor Larson's treatise on workers' compensation law:

> "The two indisputable principles [regarding the label given by the parties to a person's employment status] between which the area of controversy lies are these: first, under a system of free enterprise and free contract, workers and employers must be allowed to make any arrangement they choose, and, if a worker prefers to be an entrepreneur without compensation protection rather than an employee with compensation protection, that is his privilege; and second, it will not do to have the purposes of compensation legislation thwarted by the device of classifying workers as partners or contractors when in substance they are employees." (1C A. Larson, Workmen's Compensation §46.10, at 8—244 (1986).)

The case law reflects the difficulty raised by Professor Larson. It has been held that the label given by the parties in a written agreement will not be dispositive of the employment status, but that the facts of the case must be considered to determine what the individual's employment status is. *Yellow Cab Co. v. Industrial Comm'n* (1984), 124 Ill. App. 3d 644, 464 N.E.2d 1079.

■■ ■ Further, although a contractual agreement is a factor to consider, it does not, as a matter of law, determine an individual's em-

ployment status. (*Wenholdt*, 95 Ill. 2d 76, 447 N.E.2d 404.) Again, however, we quote Professor Larson:

> "In a close case, it [the employment status designated in a contract] may swing the balance by aiding in establishing the true intent of the parties—and, after all, that intent is entitled to considerable respect if it can be accurately ascertained." (1C A. Larson's Workmen's Compensation, §46.30, at 8—263-64 (1986).)

Thus, we are confronted here with whether the classification of independent contractor by the parties was merely a sham label or whether it was the intent of the parties that the claimant be considered an independent contractor. It does not appear that the status of independent contractor given to the claimant in the lease agreement was a sham label, and the claimant did not testify that he did not understand this language of the contract; therefore, we will consider the employment status given to the claimant in the lease as indicative of the intent of the parties, and we will give consideration to this factor.

■ Another factor to be considered is that the claimant provided workers' compensation insurance for himself and for his drivers, which implied an independent-contractor status. However, because the claimant testified that it was only at the respondent's insistence that he paid for this insurance, this factor was, at best, a weak indication that the claimant was an independent contractor. Again, this factor is not conclusive, but it is another factor to be weighed.

■ From the foregoing analysis, it is clear that this case is a close one, and that given the evidence, the inference of the claimant's employment status could have been as easily determined to be an employee as an independent contractor. Because the facts of this case were susceptible to either interpretation, it was the Industrial Commission's province to determine the claimant's employment status, and if the determination of the Industrial Commission was not against the manifest weight of the evidence, it should not be overturned. (*Kirkwood*, 84 Ill. 2d 14, 416 N.E.2d 1078.) We do not find that the Commission's decision was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Morgan County confirming the Industrial Commission's decision is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.