Docket No. 102723.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

DONALD D. ROBERSON, Appellee, v. THE INDUSTRIAL COMMISSION (P.I. & I. Motor Express, Inc., Appellant).

*Opinion filed March 22, 2007.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Donald Roberson filed a claim for benefits under the Workers' Compensation Act (see 820 ILCS 305/1 *et seq.* (West 2004)) after he was injured while delivering a load of steel coils for P.I. & I. Motor Express, Inc. (P.I. & I.). An arbitrator denied this claim, and the Illinois Industrial Commission[1] reversed the arbitrator's decision, finding an employment relationship between Roberson and P.I. & I., as well as a causal relationship between Roberson's injury and his work. The circuit court of Montgomery County reversed the Commission's decision, and the appellate court reversed the trial

---

[1]On January 1, 2005, the name of the Illinois Industrial Commission was changed to the Illinois Workers' Compensation Commission. See 820 ILCS 305/1(c) (West 2004).

court's decision (No. 5–05–0279WC (unpublished order under Supreme Court Rule 23)), concluding that the Commission's decision was not against the manifest weight of the evidence. For the reasons that follow, we affirm.

BACKGROUND

Roberson worked for P.I. & I. as an employee truck driver from March to May 2000, when he bought his own truck. On May 15, 2000, Roberson signed an "INDEPENDENT CONTRACTOR CONTRACT" with P.I. & I. Under the contract, Roberson would receive 78% of the gross revenue received by P.I. & I. for each load in exchange for the services of a driver and the equipment listed in Appendix A to the contract–namely, his truck. Appendix A provided:

> "P.I. & I. MOTOR EXPRESS, INC. hereby receipts for the equipment hereinafter described, this receipt being executed pursuant to [federal regulations] and to the extent as therein specified and directed P.I. & I. MOTOR EXPRESS, INC. shall during the duration of this receipt have the exclusive possession, control and use of the equipment and to the extent required by the Motor Carrier Act, P.I. & I. MOTOR EXPRESS, INC. shall be deemed to have assumed complete responsibility for the operation of the equipment in the transportation of the commodities; provided however, that this receipt shall not affect the legal relations between P.I. & I. MOTOR EXPRESS, INC. and the Contractor, his agents or employees as set forth in this Independent Contractor Contract to which this receipt is an appendix ***."

Roberson was responsible for all costs and expenses associated with operating his truck, including fuel, tolls, license plates, and taxes. The contract permitted Roberson to have employees, and he was required to have worker's compensation insurance coverage for himself and any employees. The contract contained an option to obtain such coverage through P.I. & I. Roberson also was required to have liability insurance coverage. The contract provided that Roberson must maintain and operate the equipment in compliance with all applicable laws and regulations, notify P.I. & I. of any accidents, and cooperate with P.I. & I. in investigating any accidents.

At its discretion, P.I. & I. could advance monies to Roberson or pay for items which were his responsibility; such monies would then be deducted from Roberson's weekly settlements. Upon "reasonable request," P.I. & I. could agree to "trip lease," or broker, Roberson's truck to another motor carrier, in accordance with federal regulations and on three conditions: (1) the other motor carrier appeared on P.I. & I.'s approved list; (2) Roberson obtained a release number from P.I. & I. before the trip; and (3) P.I. & I. had no freight available to load. If these conditions were not met, P.I. & I. would not agree to trip lease the truck.

The contract specifically provided that it was "not intended to create an employee/employer relationship" between Roberson and P.I. & I., and further that P.I. & I. "shall have no direction or control" of Roberson "except in the results to be obtained." The parties agreed that the contract should be "interpreted in accordance with this expressed intent." Either party could terminate the contract at any time upon written notice.

Appendix C to the contract was an "EQUIPMENT AND SERVICES TO INDEPENDENT CONTRACTOR CONTRACT" under which Roberson leased a trailer from P.I. & I. Roberson was required to pay as rent 10% of the revenue received by P.I. & I. for each load. He was further required to operate the trailer in compliance with all applicable laws and regulations, and to notify P.I. & I. of any accidents. Roberson was responsible for all expenses associated with the trailer, except for "normal scheduled preventative maintenance," and he agreed to follow P.I. & I.'s maintenance schedules. This contract provided that any service and repair of the trailer must be performed according to P.I. & I.'s instructions, by P.I. & I. or at its designated facility.

On January 5, 2001, Roberson left home for P.I. & I.'s Granite City terminal to pick up a load. He then drove to Bethlehem Steel in northwest Indiana, unloaded the vehicle, and reloaded it with two large steel coils. The coils were covered with a tarp and secured with chains and ratchet binders. Instead of delivering these coils to Red Bud, Illinois, Roberson returned home because he was experiencing mechanical problems with his truck. Roberson advised P.I. & I. of the delay, and P.I. & I. instructed him to deliver the load as soon as possible. On January 11, he left home to deliver the load. In Red Bud,

Roberson removed the tarp and chains from the steel coils, and began to unfasten the ratchet binders. As he was pushing on a ratchet, it gave way. Roberson tumbled forward, fell into the side of one of the coils, and landed on his back. Roberson felt pain, but continued to work, believing that it would go away. Though he intended to sleep in his truck at P.I. & I.'s terminal and pick up a new load the next day, Roberson's pain increased, and he again returned home. The next morning, he visited an emergency room, complaining of pain in his lower back, shoulder, and neck, and numbness in his right leg.

Emergency room records indicate that Roberson injured his back while unloading his truck. According to the initial nurse evaluation form, as Roberson was removing a load with a ratchet binder, the binder "let go," and Roberson twisted his body. He felt a "pull and pop" in his lower back, and pain went up his back to his neck. As time passed, the pain got worse. Roberson told the nurse, "It feels like I had the crap beat out of me." His back was tender, and he could not lay down on it. An X ray of his back revealed no abnormalities, and the initial diagnosis of the emergency room doctor was "acute back and neck strain with spasm." Roberson was given pain medication, including Vicodin and Flexeril, advised to see his own physician, and instructed to stay off work until January 15.

On January 12, Roberson visited Dr. Assa Mayersdorf, a neurologist with whom he had made an appointment before the accident to discuss nonconvulsive seizure episodes. Dr. Mayersdorf's office notes indicated that "[i]n the last two days," Roberson had taken Vicodin and Flexeril "because of low back pain which happened when he slept [*sic*] in the truck."

On January 15, Roberson visited his physician, Dr. Jose Villegas. In his evidence deposition, Dr. Villegas stated that Roberson claimed he injured his shoulder and back four days earlier while ratcheting a load of steel. Roberson had stiffness and generalized pain in the lower back area, as well as numbness in his right leg. Dr. Villegas' initial diagnosis was lumbosacral spine and cervical neck strain. Dr. Villegas again examined Roberson on January 29, 2001. Roberson stated that his pain had continued and had become more localized. He had trouble sleeping and experienced tingling and numbness in his legs. Dr. Villegas ordered physical therapy and a CT scan. According to Dr. Villegas, the CT scan showed that Roberson had a herniated

disc in his lower back, which was consistent with his symptoms. Dr. Villegas reexamined Roberson on February 9 and 28, 2001. On February 9, Roberson showed improvement, and on February 28, he had no back pain and was ready to resume work. Dr. Villegas opined that there was a causal relationship between Roberson's accident at work and his back pain: "I haven't seen Mr. Roberson for any prior history of back problems. *** And because of the symptoms and physical findings and the CT can, it seems to correlate well to his back injury."

Roberson filed a worker's compensation claim on February 8, 2001. At the arbitration hearing, Roberson testified regarding his relationship with P.I. & I. According to Roberson, he would telephone P.I. & I. each morning to see if any loads were available. Before Roberson began hauling a load, P.I. & I. required him to perform pretrip inspections, and to keep and turn in a logbook bearing P.I. & I.'s name and logo. Roberson asserted that on several occasions P.I. & I. had given him a "hot load" to deliver and return back as quickly as he could.

Roberson acknowledged that he could choose his routes and where to obtain fuel or repairs. P.I. & I. provided him a debit card that he could use at any truck stop to buy fuel, pay for repairs, or obtain cash advances, and these expenses were later deducted from his weekly settlements. According to Roberson, P.I. & I. helped him secure "bobtail and dead head" liability insurance coverage, and the premiums were also deducted from his settlements. Additionally, before the accident P.I. & I. deducted workers' compensation insurance coverage premiums from his settlements. Roberson stated that P.I. & I. stopped withholding taxes from his settlements after he entered the independent contractor contract. P.I. & I. provided a camera with which to photograph an accident scene or a damaged load.

Roberson further stated that once he started driving for P.I. & I., he did not make deliveries for other trucking companies. He explained that he could have obtained authorization to haul loads for other companies, but that "[t]here was just so much paperwork *** you just didn't do it." On direct examination, Roberson stated that he worked for three other trucking companies in 2000 before he became a P.I. & I. employee. On cross-examination, Roberson stated he

actually worked for two of those companies–Castle Trucking, Inc., and AMS, LLC–after he entered the independent contractor contract with P.I. & I. Roberson also acknowledged that in 1992 he filed a worker's compensation claim for a lower back injury sustained while working for another trucking company. Roberson's application asserted that his lower back and left leg were injured while lifting and mounting a truck tire, resulting in a "probable ruptured disc with radiculopathy." That claim was denied.

P.I. & I. performed an annual review of Roberson's work. A September 17, 2001, letter from P.I. & I. Safety Director Patty Caldwell congratulated Roberson on his professionalism and quality effort. A copy of this letter was placed in Roberson's "personnel file for future reference." A December 3, 2001, letter from Cardwell informed Roberson that his independent contractor's contract had been cancelled by P.I. & I. effective November 30, 2001.

P.I. & I. presented the evidence deposition of its president, Joseph Kerola. Kerola explained:

> "Independent contractors in our industry are gentlemen who own their own tractors or tractors and trailers. We pay them a percentage of the revenue they generate to provide the tractor, the trailer.
>
> They're also responsible, they purchase their own license plates, pay their own fuel taxes, buy their own fuel, their own tires, tarps, maintenance. The money we pay them, which is on a 1099, is very simply their percentage, and they pay all their own bills for that out of the money we pay them. As an independent contractor, that is a *** long-term lease to us, they primarily, then, work for us. There's nothing in there that prohibits them from working for other people as long as they let us know, and that's done because the Department of Transportation requires a motor carrier, a licensed motor carrier to keep certain records as far as driver's licenses, random drug or alcohol tests and some other things like that, so they need to be leased to a motor carrier primarily. ***
>
> Also, the work we have, if they choose not to work for a week or so, then they can choose not to do that. They are totally their own boss."

-6-

Kerola stated that when Roberson worked as an employee driver, P.I. & I. had "100-percent control" over his work. But as an independent contractor, Roberson was an "independent businessman," making his own decisions.

Kerola agreed that employee drivers are a major expense. P.I. & I. has very few employee drivers–"one or two at the most"–and 150 independent contractors. P.I. & I. also has very few trucks, preferring instead to lease them from independent contractors. Kerola stated that P.I. & I. requires only that its independent contractors comply with Department of Transportation (DOT) regulations, though P.I. & I. does ask its drivers "to call in daily to report their status."

According to Kerola, P.I. & I. does not require independent contractors to wear uniforms, and they may fuel and repair their trucks at their discretion. Their routes are also left to their discretion, as long as they deliver loads in a timely manner and keep P.I. & I.'s customers happy. Kerola added that when drivers are given a load, they are also given "the parameters with which that load needs hauled." The drivers may then accept or reject the load. "But if they accept it," stated Kerola, "we expect them to follow standard procedures." On this point, Kerola distinguished employees from independent contractors. P.I. & I. takes some control over the routes that employee or company drivers take; to a degree, these drivers would be "directed on what routes are acceptable and unacceptable because of the relationship with them and them driving a truck [for which] we are buying the fuel, paying the tolls, paying the maintenance. We want to make sure it runs in the lanes and routes that we feel are the most economical." Independent contractors do not receive such suggestions. Some independent contractors would take the same routes; some would not.

Kerola stated that independent contractors do not need written permission for trip leases. Because P.I. & I. is the "primary lease" and keeps records of its drivers, independent contractors must notify P.I. & I. that they wish to work for another company. P.I. & I. then sends a form to that company stating that the driver's records are in its possession and in order. Kerola further stated that drivers primarily leased to P.I. & I., like Roberson, are required by the DOT to keep a logbook, so the DOT can determine whether they are complying with regulations regarding "hours of service." P.I. & I. tries to ensure that

its drivers–both employees and independent contractors–satisfy these regulations. "If not," stated Kerola, "we do what we need to do to get them in compliance."

P.I. & I. does not withhold taxes for independent contractors. According to Kerola, P.I. & I. offers independent contractors the opportunity to participate in certain programs to save them money. Independent contractors may purchase occupational hazard insurance coverage, as well as equipment insurance coverage, through P.I. & I. Kerola described these as "pass-through" programs; the insurer covers the independent contractors directly; P.I. & I. simply groups them together to obtain more affordable coverage for them.

P.I. & I. also presented the evidence deposition of its regional manager, Charles Butts. Butts stated that when Roberson was an employee driver, he was required to report to work between 8 and 10 o'clock each morning. When he became an independent contractor, he was not required to report to work. Employees can refuse one load; independent contractors can refuse any load. Employees are instructed where to obtain fuel; independent contractors are not because they buy their own fuel. According to Butts, once employees deliver their loads, they must report back to the P.I. & I. terminal. Independent contractors are not required to do so. Butts stated that P.I. & I. specifies routes for its employees, but not for its independent contractors.

According to Butts, Roberson was primarily leased to P.I. & I. That is, Roberson's primary business was with P.I. & I. Butts insisted that P.I. & I. does not require pretrip inspections, but the DOT does–for any drivers, both employees and independent contractors. The DOT also requires independent contractors to post logos of the company for which they are driving on their trucks. Like Kerola, Butts insisted that P.I. & I. did not enforce the contract provision requiring written permission for trip leases. Roberson was "required to or asked to call in and just tell us that he was going to" trip lease.

Butts stated that the annual review was required by P.I. & I.'s liability insurer to determine whether its drivers had valid licenses and any unreported tickets or accidents. P.I. & I. was required by the DOT to insure any truck, whether owned by the company or an independent contractor. Other insurance–cargo or worker's

compensation–would be the responsibility of the independent contractor.

The arbitrator found that Roberson was not P.I. & I.'s employee and that his injury was not work-related. The Industrial Commission reversed. Relying on *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117 (2000), the Commission found that P.I. & I. "both had and exercised a right to control [Roberson's] work activities." Appendix A of the independent contractor contract provided P.I. & I. with exclusive possession, control and use of Roberson's equipment, as required by federal regulations. Roberson was required to report any accidents to P.I. & I. and to maintain the trailer he leased according to P.I. & I.'s instructions.

The Commission added that the record contained "other indicia of control." The Commission first addressed the provision in the parties' contract stating that P.I. & I. shall have no direction or control over the contractor "except in the results to be obtained." The Commission characterized this as "a significant exception" because it could be interpreted to mean that an employer could dictate to a contractor the terms of delivery, and Roberson testified that he received all of his delivery instructions from P.I. & I. The Commission also noted that, while Roberson could "trip lease" with P.I. & I.'s consent, he opted to drive exclusively for P.I. & I. because its trip lease requirements were so onerous. Roberson, thus, was primarily leased to P.I. & I.

The Commission further highlighted the fact that Roberson was required to display P.I. & I. logos on his equipment and to perform pretrip inspections. The Commission acknowledged that these requirements were imposed by DOT regulations, but P.I. & I.'s compliance with these regulations did not diminish its control over Roberson's work. The Commission also found that the services Roberson provided for P.I. & I. constituted a regular part of its business: "It is not as if [Roberson] was an outside contractor brought in to perform a special service." The Commission finally likened the parties' relationship to employment at-will because the contract could be terminated upon written notice alone, absent any allegation of its breach.

Additionally, the Commission found that Roberson suffered a work-related injury. Roberson provided "a very detailed account of

his accident," which was consistent with the history he gave at the emergency room. The Commission stated that the "puzzling inconsistency" about whether Roberson's back pain was caused by sleeping in his truck was insufficient to defeat the entire claim. The Commission awarded Roberson 7 3/7 weeks of temporary total disability and $5,708 in medical expenses, and further found 10% permanent disability.

P.I. & I. sought judicial review. The trial court found that the Commission's decision was against the manifest weight of the evidence, and reinstated the arbitrator's decision. Roberson appealed, and the appellate court reversed. Regarding the issue of whether Roberson was P.I. & I.'s employee, the appellate court initially noted that this determination is fact specific. The appellate court stated that here

> "[t]he parties' relationship contained elements of both independent contractor and employment status. Factors such as the manner in which claimant was paid; the parties' labeling of their relationship; claimant providing his own tractor and trailer; claimant paying for his own expenses, such as insurance and fuel; and the fact that claimant could refuse loads and choose his own routes indicate an independent contractor status.
>
> On the other hand, there were significant elements of control present here. Most importantly, the contract gave employer exclusive possession, use, and control of the equipment. Although the contract contained a caveat that such exclusive possession did not affect the parties' legal relationship, the caveat is merely a labeling provision, which is a factor of lesser weight. The fact of exclusivity and control remained." No. 5–05–0279WC (unpublished order under Supreme Court Rule 23).

The appellate court further noted that P.I. & I. controlled many aspects of Roberson's work. He was required to display P.I. & I. logos, to communicate with P.I. & I. regularly, and to meet P.I. & I.'s pick-up and delivery schedule. According to the appellate court, Roberson did not work for other companies because it was too much trouble: "The parties contract allowed [Roberson] to trip lease, but placed restrictions on his ability to do so. Notably, one condition of

-10-

trip leasing was that no freight of employer was available to load." The appellate court concluded that this case was close, but the Commission's finding of an employment relationship was not against the manifest weight of the evidence.

Regarding the issue of whether Roberson's injury was work-related, the appellate court again concluded that the Commission's finding was not against the manifest weight of the evidence. According to the appellate court, the Commission found that, despite some inconsistencies in Roberson's version of the events leading to his injuries, he essentially gave a plausible account of the accident.

On denial of rehearing, all five justices of the appellate panel filed a statement that the case involves a substantial question warranting consideration by this court. We allowed P.I. & I.'s petition for leave to appeal. See 210 Ill. 2d R. 315(a).

ANALYSIS

In worker's compensation cases the Industrial Commission is the ultimate decisionmaker. *Cushing v. Industrial Comm'n*, 50 Ill. 2d 179, 181-82 (1971). The Commission must weigh the evidence presented at the arbitration hearing and determine where the preponderance of that evidence lies. See *Steiner v. Industrial Comm'n*, 101 Ill. 2d 257, 260 (1984); *Wagner Castings Co. v. Industrial Comm'n*, 241 Ill. App. 3d 584, 594 (1993) ("it is *solely* within the province of the Commission" to weigh the evidence (emphasis in original)). A reviewing court will not set aside the Commission's decision unless its analysis is contrary to law (see *Butler Manufacturing Co. v. Industrial Comm'n*, 85 Ill. 2d 213, 216 (1981)) or its fact determinations are against the manifest weight of the evidence (see *Shockley v. Industrial Comm'n*, 75 Ill. 2d 189, 193 (1979)). Fact determinations are against the manifest weight of the evidence only when no rational trier of fact could have agreed with the agency. See *D.J. Masonry Co. v. Industrial Comm'n*, 295 Ill. App. 3d 924, 930 (1998).

This case, as framed in the appellate court, presents two issues: (1) whether the Commission's determination that an employment relationship existed between Roberson and P.I. & I. was against the manifest weight of the evidence, and (2) whether the Commission's

determination that Roberson's injury arose out of and in the course of his employment was against the manifest weight of the evidence.

In its petition,[2] P.I. & I. attempts to recast the first issue. According to P.I. & I., the appellate court's employment-relationship analysis conflicts with that of *Earley v. Industrial Comm'n*, 197 Ill. App. 3d 309 (1990), in several respects, including the effect of federal regulations on the relationship between P.I. & I. and Roberson. P.I. & I. asserts that on these questions of law our review should proceed *de novo*. Roberson responds that the appellate court's analysis was consistent with *Earley*, and the primary question is still whether he was an employee of P.I. & I. Roberson asserts that on that fact issue our review should be deferential. Because the Commission's decision was not against the manifest weight of the evidence, argues Roberson, this court should affirm.

An employment relationship is a prerequisite for an award of benefits under the Act, and the question of whether a person is an employee remains "one of the most vexatious *** in the law of compensation." *O'Brien v. Industrial Comm'n*, 48 Ill. 2d 304, 307 (1971). The difficulty arises not from the complexity of the applicable legal rules, but from the fact-specific nature of the inquiry. No rule has been, or could be, adopted to govern all cases in this area. *Henry v. Industrial Comm'n*, 412 Ill. 279, 282 (1952). Instead, we have listed various factors that help determine when a person is an employee: whether the employer may control the manner in which the person performs the work; whether the employer dictates the person's schedule; whether the employer pays the person hourly; whether the employer withholds income and social security taxes from the person's compensation; whether the employer may discharge the person at will; and whether the employer supplies the person with materials and equipment. See *Wenholdt v. Industrial Comm'n*, 95 Ill. 2d 76, 81 (1983), quoting *Morgan Cab Co. v. Industrial Comm'n*, 60 Ill. 2d 92, 97 (1975). Additionally, we have also considered whether the employer's general business encompasses the person's work:

---

[2]P.I. & I. elected to proceed on the argument presented in its petition and did not file a separate appellant's brief.

"[B]ecause the theory of [worker's] compensation legislation is that the cost of industrial accidents should be borne by the consumer as part of the cost of the product, this court has held that a worker whose services form a regular part of the cost of the product, and whose work does not constitute a separate business which allows a distinct channel through which the cost of an accident may flow, is presumptively within the area of intended protection of the compensation act." *Ragler Motor Sales v. Industrial Comm'n*, 93 Ill. 2d 66, 71 (1982).

No single factor is determinative, and the significance of these factors will change depending on the work involved. *Luby v. Industrial Comm'n*, 82 Ill. 2d 353, 358-59 (1980). The determination rests on the totality of the circumstances.

The right to control the manner of the work is often called the most important consideration. See *Bauer v. Industrial Comm'n*, 51 Ill. 2d 169, 172 (1972); *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004) ("An independent contractor is defined by the level of control over the manner of work performance"), citing *Hartley v. Red Ball Transit Co.*, 344 Ill. 534, 539 (1931). Discussing *Ware*, the appellate court here noted that contract language required by federal regulations may indicate such control.

More than 50 years ago, interstate motor carriers shielded themselves from liability for their drivers' negligence by leasing trucks from independent contractors. *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 37 (Tex. Ct. App.–Fort Worth 2002). Such arrangements invariably led to abuses that threatened public safety, as unscrupulous motor carriers leased inexpensive, and unsafe, equipment from shallow-pocket drivers. *Harris v. Mitchell*, 358 N.J. Super. 504, 507-08, 818 A.2d 443, 445 (2003). In 1956, Congress amended the Interstate Commerce Act and authorized the Interstate Commerce Commission (ICC) to prescribe regulations governing leased equipment. See Pub. L. No. 84–957, reprinted in 1956 U.S.C.C.A.N. 1163. In 1995, Congress abolished the ICC; its functions were transferred to the DOT and the Surface Transportation Board, and many sections of the Interstate Commerce Act were recodified. See *Harris*, 358 N.J. Super. at 508, 818 A.2d at 445. Section 14102(a)(4) of that Act currently provides:

"The Secretary [of Transportation] may require a motor carrier providing [interstate] transportation *** that uses motor vehicles not owned by it to transport property under an arrangement with another party to *** have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier." 49 U.S.C. §14102(a)(4) (2000).

See *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 39, 46 L. Ed. 2d 169, 178, 96 S. Ct. 229, 235 (1975).

The DOT requires a motor vehicle lease to provide that "the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. §376.12(c)(1) (2005). This regulation, like its precursors, prevents motor carriers from escaping liability to injured persons by claiming that their drivers were independent contractors, rather than employees. See *St. Paul Fire & Marine Insurance Co. v. Frankart*, 69 Ill. 2d 209, 213 (1977); *Schedler v. Rowley Interstate Transportation Co.*, 68 Ill. 2d 7, 13 (1977); *Hershberger v. Home Transport Co.*, 103 Ill. App. 3d 348, 352 (1982); *Stonerock v. Miller Brothers Paving, Inc.*, 72 Ohio App. 3d 123, 128, 594 N.E.2d 94, 97 (1991) ("These regulations, and the statute pursuant to which they were promulgated, were created in order to correct widespread abuses by authorized interstate carries who would immunize themselves from liability to the public by leasing trucks from third parties"), citing *American Trucking Associations v. United States*, 344 U.S. 298, 303, 97 L. Ed. 337, 352, 73 S. Ct. 307, 311 (1953).

Pursuant to this regulation, some courts have characterized independent contractor lessors as "statutory employees" of motor carrier lessees. See, *e.g.*, *Harris*, 358 N.J. Super. at 509, 818 A.2d at 446, quoting *Cox v. Bond Transportation, Inc.*, 53 N.J. 186, 201, 249 A.2d 579, 587 (1969); *Tamez v. Southwestern Motor Transport, Inc.*, 155 S.W.3d 564, 573 (Tex. Ct. App.–San Antonio 2004) ("an

interstate carrier is vicariously liable as a matter of law under the [regulations] for the negligence of its statutory employee drivers"). This is a legislative fiction, of course, intended to shift responsibility for the safe use of leased equipment to the motor carrier in order to protect the public. *Harris*, 358 N.J. Super. at 510, 818 A.2d at 446. The statutory scheme created by Congress plainly accepts a distinction between employees and independent contractors. See *Pouliot v. Paul Arpin Van Lines, Inc.*, 292 F. Supp. 2d 374, 383 (D. Conn. 2003) ("the existence of a lease under regulations that impose liability between the carrier-lessee and the public does not have any impact on the type of relationship that exists between the carrier-lessee and the contractor-lessor"). Indeed, as P.I. & I. observes, 49 C.F.R. §376.12(c)(4) (2005) provides:

> "Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier complies with 49 U.S.C. 14102 and the attendant administrative requirements."

In short, the regulation requiring a motor carrier to have exclusive possession, control, and use of leased equipment does not mandate that the driver is an employee for all purposes. "While a lessee cannot free itself of its federally imposed duties when protection of the public is at stake, the federal requirements are not so radically intrusive as to absolve lessors *** of otherwise existing obligations under applicable state tort law doctrines *or under contracts allocating financial risk among private parties*." (Emphasis added.) *Carolina Casualty Insurance Co. v. Insurance Co. of North America*, 595 F.2d 128, 138 (3d Cir. 1979). Freedom of contract requires that parties may structure their relationship as they see fit, provided they do not neglect the requirements of federal law. See *Riddle v. Trans-Cold Express, Inc.*, 530 F. Supp. 186, 189-90 (S.D. Ill. 1982) ("the lessor and lessee of equipment operated under an I.C.C. certificate are free to agree, by contract, as to rights affecting their relationship, so long as their duty to the general public is not diminished"). Compliance with federal regulations is merely a factor that may be considered in a common law analysis of whether a driver is an employee of a

trucking company. *Universal Am-Can, Ltd. v. Worker's Compensation Appeal Board*, 563 Pa. 480, 489, 762 A.2d 328, 332 (2000); *Toomer v. United Resin Adhesives, Inc.*, 652 F. Supp. 219, 229 (N.D. Ill. 1986).

*Ware* and *Earley* are consistent on this point. Both cases state that contract language required by federal regulations is a consideration in determining whether the trucking company had the right to control the driver's work. See *Ware*, 318 Ill. App. 3d at 1123; *Earley*, 197 Ill. App. 3d at 314. These cases, however, reach different results on different facts. P.I. & I.'s argument thus reduces to simply this: the Commission relied upon *Ware*, when it should have followed *Earley*.

In *Ware*, a truck driver was injured while making delivery for a trucking company. At the time of the accident, the driver and the company were operating under an "Equipment Lease Agreement Between Independent Contractor and Carrier." The agreement provided that the driver would lease his truck to the company in return for a percentage of the gross revenue that the company received for each load. Under the agreement, the company would have "exclusive possession, control, and use" of the truck "for the limited purpose of complying with state and federal transportation law."

The driver was required to shave and occasionally to wear a uniform, and the company arranged for his work. The company would issue a travel order, instructing the driver what load he would be hauling, when to pick it up, and when and where to deliver it. The travel order included route information, which the driver was not required to follow unless he was hauling hazardous materials. The company dictated how the driver should operate and maintain his truck, particularly in cold weather. The driver was responsible for inspecting the truck and its trailer, and he was required to notify the company if he had an accident. The company's logo was displayed on the side of the driver's truck, and it was registered in the company's name, as required by federal regulations. The driver was forbidden to drive more hours than allowed by those regulations.

The driver shouldered all the costs associated with operating the truck. The company did not withhold income or social security taxes for the driver. The company paid for liability insurance on the truck while it was in its service and for "bobtail" insurance on the truck while it was not in its service; the cost of the bobtail insurance was

charged to the driver. Under the lease, the driver was required to procure worker's compensation insurance, and he was allowed to enroll in an occupational accident plan through the company. The lease allowed the driver to hire employees and to use his truck for other firms, subject to the company's approval. The lease could be terminated by either party upon written notice.

An arbitrator determined that the driver was an employee of the company, and the Commission reversed. The trial court confirmed this decision, but the appellate court found that it was against the manifest weight of the evidence. *Ware*, 318 Ill. App. 3d at 1127. The appellate court concluded that the evidence indicated that the company both had and exercised a right to control the driver's work. *Ware*, 318 Ill. App. 3d at 1123. The court recognized that the company exercised this control to ensure it complied with federal regulations or customer demands, but held that the motivation for its actions was "irrelevant." *Ware*, 318 Ill. App. 3d at 1123. The court stated that a showing of control may arise " 'by introducing detailed regulations *** and proving that the employer was personally responsible for their observance.' " *Ware*, 318 Ill. App. 3d at 1123, quoting 3 A. Larson & L. Larson, Worker's Compensation Law §61.05(3), at 61–9 (2000).

The appellate court further stated that the driver's work was "intimately related" to the company's business. *Ware*, 318 Ill. App. 3d at 1124-25. The driver "had no customers of his own. He worked exclusively for [the company], served customers designated by [the company], and was paid a percentage of what [the company] received from these customers." *Ware*, 318 Ill. App. 3d at 1124-25. The company's business was hauling freight for its customers; the driver's work, likewise, was hauling freight for the company's customers. *Ware*, 318 Ill. App. 3d at 1125. The driver was engaged in a long, continuous, and exclusive relationship with the company, and he did not trip lease. *Ware*, 318 Ill. App. 3d at 1126. The relationship was akin to at will employment and could be terminated absent a breach by either party. *Ware*, 318 Ill. App. 3d at 1126. Additionally, the appellate court stated that the company provided a trailer for the driver, and he sometimes wore a uniform. *Ware*, 318 Ill. App. 3d at 1125-26.

-17-

The appellate court declined to give much weight to the facts that the contract designated the driver an independent contractor and that the company did not withhold taxes. *Ware*, 318 Ill. App. 3d at 1127. Considering the factors in their totality, the court stated that "strong evidence exists that [the driver] was an employee," and the Commission's decision to the contrary was against the manifest weight of that evidence. *Ware*, 318 Ill. App. 3d at 1126. See also *Peesel v. Industrial Comm'n*, 224 Ill. App. 3d 711 (1992) (holding that the Commission's decision that a driver was not an employee was against the manifest weight of the evidence).

In *Earley*, a truck driver was injured while making a delivery for a trucking company. The driver and the company were parties to a one-year equipment lease. Under the lease, the driver would provide the truck, the trailer, and a driver, in return for a percentage of the gross revenue for each load that he hauled. From these payments, the company deducted the driver's workers' compensation insurance premiums and any cash advances, but it did not withhold income or social security taxes for the driver. The driver bore all the costs associated with operating the equipment. The driver even paid for the truck's licenses, but they were in both his name and the company's name.

The driver could hire employees, but they had to be approved by the company before they could haul any loads. Either the company would call the driver with work, or the driver would call the company for work. The company told the driver where and when to pick up and deliver loads, but the driver chose his route. The driver was instructed to notify the company if he had an accident. He primarily worked for the company, but he was permitted to trip lease. Trip leases were arranged through the company.

The arbitrator determined that the driver was not an employee of the company, and the Commission affirmed. The trial court confirmed the Commission's decision, and the appellate court affirmed. The appellate court initially noted that the driver contended the Commission's decision was erroneous as a matter of law, citing federal regulations. *Earley*, 197 Ill. App. 3d at 314. The court stated:

> "The ICC's rules *** require a lease agreement, such as the one here, to include a provision that the authorized carrier has exclusive possession, control, and use of the leased equipment

-18-

for the duration of the lease. Therefore, because Federal law requires [the company] to have the exclusive possession and control provisions in the lease, [the driver] argues that this confers upon [the company] the right to control the work ***, thereby creating an employee status *** as a matter of law. While the ICC rules and regulations are a factor to consider in determining a claimant's employment status, these rules are not conclusive ***." *Earley*, 197 Ill. App. 3d at 314.

The appellate court then stated that some facts indicated that the driver was an employee, while others indicated that he was an independent contractor. *Earley*, 197 Ill. App. 3d at 315. The company could direct the driver when and where to pick up and deliver loads, but the driver chose his own route. *Earley*, 197 Ill. App. 3d at 315. He worked solely for the company, and even his trip leases were arranged by the company. *Earley*, 197 Ill. App. 3d at 315. The court observed, however, that the driver was paid for trip leases as he was paid for other loads; he received a flat percentage of the revenue generated by his work. *Earley*, 197 Ill. App. 3d at 315. According to the court, the company "was only interested in the end result, *i.e.*, that the shipments be transported within a given time to a customer, and that the details of how this was accomplished were left to [the driver]." *Earley*, 197 Ill. App. 3d at 317. The driver paid his own income and social security taxes, as well as the costs of operating his equipment. *Earley*, 197 Ill. App. 3d at 316.

The court then considered the nexus between the driver's work and the company's business: "In trucking cases such as this, this is a close consideration." *Earley*, 197 Ill. App. 3d at 316. The driver and the company were in the same business: transporting shipments for profit. *Earley*, 197 Ill. App. 3d at 316. Regarding the right to discharge, the appellate court noted that the lease could be terminated by either party for any reason. *Earley*, 197 Ill. App. 3d at 316.

The lease labeled the driver as an independent contractor, but according to the court, this factor was controversial: "It has been held that the label given by the parties in a written agreement will not be dispositive of the employment status, but that the facts of the case must be considered to determine what the individual's employment status is. [Citation.] Further, although a contractual agreement is a factor to consider, it does not, as a matter of law, determine an

-19-

individual's employment status. [Citation.]" *Earley*, 197 Ill. App. 3d at 317-18. In a close case, however, the contract's designation of a person as an independent contractor may tip the balance by establishing the parties' intent. *Earley*, 197 Ill. App. 3d at 318, quoting 1C A. Larson, Workmen's Compensation §46.30, at 8–263-8–264 (1986). In this case, the court found that calling the driver an independent contractor was not "a sham label," and the lease indicated the parties' intent. *Earley*, 197 Ill. App. 3d at 318.

Given the competing inferences arising from the facts, it was the Commission's province to determine the driver's employment status. *Earley*, 197 Ill. App. 3d at 318. The court concluded that the Commission's decision was not against the manifest weight of the evidence. *Earley*, 197 Ill. App. 3d at 318.

Certainly, the case before us is similar in some respects to *Earley*, just as it is similar in some respects to *Ware*. But the question before us is not whether the Commission's decision tracked one case when it should have tracked another. The question is whether the Commission's decision was against the manifest weight of the evidence. We turn to that evidence.

The contract between Roberson and P.I. & I. provided that the parties did not intend to create an employment relationship, and both parties could terminate the contract at any time upon written notice. Appendix A of the lease gave P.I. & I. the exclusive possession, control, and use of Roberson's truck, but the contract stated that P.I. & I. had no control over Roberson, "except in the results to be obtained." That is, P.I. & I. did not dictate Roberson's routes, as long as, according to Kerola, "he delivers [loads] in a timely manner that keeps our customers happy." The contract required Roberson to operate his truck in compliance with applicable laws and regulations. Roberson testified that he was required to perform pretrip inspections and to post P.I. & I. logos on his truck, but Butts testified that these were DOT requirements for any of its drivers. Kerola testified that independent contractors are required by the DOT to keep a logbook, so the DOT can determine whether they are complying with regulations regarding hours of service. P.I. & I. ensures its drivers comply with these regulations. Tellingly, Kerola stated that if its drivers stray from these regulations, P.I. & I. does what it needs to do to get them in compliance. P.I. & I. even keeps personnel files and

performs annual reviews of its drivers as required by its insurer. Roberson was required to notify P.I. & I. if he had an accident, and P.I. & I. provided him with a camera to photograph any damage.

The contract stated that P.I. & I. could allow trip leases if it preapproved the other motor carrier, issued a release to Roberson, and had no freight available for Roberson to haul. Butts testified that P.I. & I. does not enforce the contract requirement of written permission, and Kerola testified that P.I. & I. does not require written permission for trip leases. But Kerola added that independent contractors must notify P.I. & I. that they wish to work for another motor carrier. P.I. & I., as the "primary lease" of these drivers, then must send a form to the other carrier stating that the drivers' records are in order. Roberson testified that he did not drive for other companies because he found the authorization process too burdensome. The record is unclear whether Roberson actually had trip leases with two other companies while he was primarily leased to P.I. & I.

Butts testified that Roberson was not required to report to work each morning, but Kerola testified that P.I. & I. asks its drivers "to call in daily to report their status." Roberson confirmed this, stating that he telephoned P.I. & I. each morning to see if any loads were available. Roberson also testified that P.I. & I. occasionally gave him a "hot load" to deliver quickly. According to Kerola, drivers are given parameters in which loads must be hauled. If drivers accept such parameters, P.I. & I. expects them to follow "standard procedures."

Roberson was paid a percentage of the gross revenue that P.I. & I. received for the loads he delivered. From his weekly settlements Roberson paid the costs and expenses of operating his truck, as well as his own taxes. Additionally, he paid for his own worker's compensation and liability insurance coverage, though he obtained such coverage through P.I. & I. P.I. & I. provides such services only to drivers primarily doing business with the company. P.I. & I. also provided Roberson with a debit card, which he could use to purchase fuel, pay for repairs, or obtain cash advances, which were later deducted from his settlements.

Roberson had his own truck, but he leased a trailer from P.I. & I. He not only paid rent on the trailer–10% of the gross revenue for each load, or approximately one-eighth of his compensation–he also maintained it to P.I. & I.'s specifications. See 3 A. Larson & L.

Larson, Worker's Compensation Law §61.07(3), at 61–19 (2006) ("control may be realistically inferred even when the employer owns only a part of the equipment, if that part is of considerable size and value"). Finally, Roberson's work fell entirely within the scope of P.I. & I.'s business. P.I. & I., for economic reasons, used independent contractor drivers almost exclusively, and Roberson was primarily leased to P.I. & I. for nearly eight months before his accident. See 3 A. Larson & L. Larson, Worker's Compensation Law §61.07(5), at 61–21 (2006) ("there is a growing tendency to classify owner-drivers of trucks as employees when they perform continuous service which is an integral part of the employer's business").

This is a close case. The same reasoning employed in *Earley* to uphold the Commission's decision leads us to do the same. The evidence here was well balanced; it was the Industrial Commission's province to weigh it and decide among competing inferences. See *Earley*, 197 Ill. App. 3d at 318. The Commission found Roberson to be an employee of P.I. & I. We cannot say that decision was against the manifest weight of the evidence.

With respect to the second issue, P.I. & I. argues that the appellate court erred in concluding that the Commission's decision on causation was not against the manifest weight of the evidence. According to P.I. & I., the record does not support Roberson's testimony regarding his work and injury. P.I. & I. points to various discrepancies between Roberson's testimony and the record. Roberson predictably responds that the appellate court did not err.

As the appellate court correctly observed, Roberson's testimony provided a detailed account of this accident, consistent with the history he gave at the emergency room on the morning after the accident, and to Dr. Villegas four days later. Roberson testified that he notified P.I. & I. of this accident, and Kerola and Butts did not dispute his testimony. The Commission noted a "puzzling inconsistency" in Dr. Mayersdorf's records, but the statement in Dr. Mayersdorf's records that Roberson hurt his back sleeping in his truck is neither puzzling nor inconsistent. The emergency room records indicate that Roberson was prescribed Vicodin and Flexeril after he slipped in his truck. Dr. Mayersdorf's records indicate that Roberson was prescribed those same painkillers after he "slept" in his truck two days earlier. Dr. Villegas testified that it was unlikely that

-22-

Roberson could herniate a disc, as shown by the MRI test, in his sleep. Absent any evidence that Roberson slept in his truck on the day of the accident, it seems likely that "slept" is a typographical or transcription error for "slipped." The findings of fact made by the Commission were not against the manifest weight of the evidence.

## CONCLUSION

For the reasons that we have stated, we affirm.

*Affirmed.*